# ILLINOIS OFFICIAL REPORTS

---

*People v. Stephens*, **2012 IL App (1st) 110296**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NATHANIEL STEPHENS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-0296 |
| Filed | October 26, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's postconviction petition making several allegations, including claims that the trial court erred in failing to *sua sponte* order a fitness hearing and that trial counsel was ineffective in failing to request such a hearing, was properly dismissed at the first stage, but defendant's consecutive sentences for first degree murder were vacated and the cause was remanded for resentencing, since the trial court, in response to the appellate court's earlier remand of defendant's original concurrent sentences, merely imposed consecutive sentences rather than conducting a new sentencing hearing before imposing consecutive sentences as directed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 01-CR-28427, 01-CR-28428; the Hon. Arthur F. Hill, Jr., Judge, presiding. |
| Judgment | Affirmed; cause remanded for resentencing. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Jessica D. Pamon, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Presiding Justice Lampkin and Justice Hall concurred in the judgment and opinion.

## OPINION

¶ 1      After a bench trial, defendant, 19-year-old Nathaniel Stephens, was convicted of the first degree murder and aggravated battery of four-month-old Destiny Nelson (the victim). Each offense occurred on a different date. Defendant admitted in a videotaped confession to the first degree murder by hitting the victim's head into a door frame three times and punching the victim in the ribs three times to stop the victim from crying. Defendant was originally sentenced to two concurrent sentences of 25 years' imprisonment in the Illinois Department of Corrections.

¶ 2      On December 24, 2009, we affirmed defendant's convictions, vacated the order of concurrent prison terms, and remanded for resentencing to consecutive prison terms. *People v. Stephens*, Nos. 1-05-3365, 1-05-3366 cons. (2009) (unpublished order under Supreme Court Rule 23). On remand, the trial court, in the absence of defendant and his counsel, resentenced defendant to two consecutive 25-year sentences in the Illinois Department of Corrections.

¶ 3      On this postconviction appeal, defendant argues: (1) that the trial court erred in summarily dismissing defendant's *pro se* postconviction petition because defendant made a meritorious constitutional claim that his trial counsel was ineffective for failing to request a fitness evaluation for defendant; (2) that defendant's appellate counsel was ineffective when appellate counsel failed to claim that defendant did not intelligently waive his *Miranda* rights in defendant's petition for leave to appeal to the Illinois Supreme Court; and (3) that defendant's two consecutive 25-year prison sentences are void because the trial court, upon remand, changed the sentencing from concurrent terms to consecutive terms without a sentencing hearing and in the absence of defendant and his attorney. For the reasons that follow, we affirm and remand for resentencing.

¶ 4                                          BACKGROUND

¶ 5        During 2001, defendant was the sometime-live-in boyfriend of Trenetta Richardson, the mother of the four-month-old victim. On October 25, 2001, while defendant babysat her, the victim suffered a broken leg. The victim died from blunt trauma injuries on November 2, 2001, after being in defendant's care. On November 3, 2001, in a videotaped confession, defendant admitted to hitting the victim's head into a door frame three times and punching the victim in the ribs three times on November 2, 2001, to stop the victim from crying.

¶ 6        Defendant was charged in separate indictments with: (1) aggravated battery to a child for the incident on October 25, 2001, when the victim suffered a broken leg; and (2) first degree murder for the incident on November 2, 2001, when the victim died from blunt force trauma injuries.

¶ 7                                       I. Pretrial Proceedings

¶ 8        Defendant filed a motion to suppress statements that defendant had made to the police and Assistant State's Attorney (ASA) Richard Nathaniel. Defendant argued that because of his mental retardation, he did not knowingly and intelligently waive his *Miranda* rights prior to making several statements, including the videotaped confession to the police and the ASA. To support this claim, on February 4, 2004, defense counsel presented three experts to testify to defendant's mental impairments. However, trial counsel did not request a fitness evaluation for defendant.

¶ 9        The three defense experts presented evidence of defendant's mental impairments and inability to knowingly and intelligently waive his *Miranda* rights before he made inculpatory statements. The experts were: Dr. Larry Heinrich, a certified school psychologist and board-certified forensic examiner in psychology; Dr. Roni Seltzberg, a psychiatrist employed by the circuit court of Cook County's Forensic Clinical Services; and Dr. Dawna Gutzmann, a Forensic Clinical Services psychiatrist.

¶ 10       The evaluations conducted by Drs. Seltzberg and Gutzmann were originally at the request of the State after the State was presented with Dr. Heinrich's results. However, Dr. Seltzberg's and Dr. Gutzmann's opinions supported Dr. Heinrich's findings.

¶ 11       Dr. Heinrich testified that he reviewed defendant's school records and videotaped confession and the information defendant offered him on defendant's criminal background. Dr. Heinrich evaluated defendant on October 29, 2002, by speaking with him and administering three standardized psychological tests. However, defendant did not provide Dr. Heinrich with his complete criminal history.

¶ 12       Dr. Heinrich opined that it was immediately evident to him that defendant "had very clear cognitive limitations" which "any average person could see in trying to have a conversation" with defendant. Dr. Heinrich testified that defendant informed him that "he had been in special education classes and that he had never really been able to learn to read and write and that he always had difficult[y] because what he thought may have been the result of fluid on his brain when he was a young child."

¶ 13       Dr. Heinrich opined that defendant suffers from mild retardation. Based on the Weschler

test, Dr. Heinrich testified that defendant's full-scale IQ score is 64, which places him in the mildly mentally retarded range, which is typically between 65 and 70. Based on the Wide-Range Achievement Test, which measures spelling, word reading, and math, defendant "was functioning at about the first-grade level at best" and at the third-grade level for math.

¶ 14 After viewing the videotaped confession, Dr. Heinrich testified that defendant was "quite stilted and formatted" because defendant "generally agreed or disagreed [to questions presented to him] without volunteering or providing much spontaneous [personal] information."

¶ 15 Dr. Heinrich's overall opinion was that defendant was unable to intelligently and voluntarily waive his *Miranda* rights due to his cognitive limitations and vulnerability to suggestion. Dr. Heinrich also testified that defendant did not understand the difference between an assistant State's Attorney and a public defender nor the purpose of the attorney who was present with defendant during the videotaped confession.

¶ 16 Dr. Heinrich did not verify defendant's criminal history and was unaware that defendant was arrested a total of nine times with two convictions on drug charges. Dr. Heinrich also "did not go over each of the *Miranda* rights" with defendant and his opinions are therefore not based on defendant's explanation to his understanding or lack of understanding of each individual right.

¶ 17 Dr. Seltzberg testified that she reviewed Dr. Heinrich's report, defendant's records, police reports, the victim's autopsy, the transcript of the videotaped confession, the video itself, defendant's school records, and defendant's criminal record before meeting with defendant.

¶ 18 Dr. Seltzberg testified that defendant's alternative to high school under the Cook County Department of Corrections concluded on August 9, 2002; that defendant was taking classes to continue his education and has a "disability at the cognitively delayed two, No. 2, moderate level"; and that his reading scores were at the kindergarten level, and his math scores were at the third-grade level. Additionally, his psychological evaluation conducted on December 2, 2002, by the school, showed that defendant has "global intellectual reasoning deficits."

¶ 19 Dr. Selztberg testified that on June 9, 2003, before conducting her interview with defendant, she advised defendant of the purpose of the interview and that it was nonconfidential. Dr. Seltzberg testified that defendant had difficulty comprehending her advisory statements and that she had to repeat them and "break it down even more simply."

¶ 20 During the interview, Dr. Seltzberg testified that defendant stated that he assumed ASA Nathaniel was his defense lawyer because an officer told him that "a lawyer would be coming for him" and that when ASA Nathaniel arrived he introduced himself "as a person by the name of Nate" and "talked about having the same name." Dr. Seltzberg testified that defendant thought he would be let go if he "told them what they wanted."

¶ 21 When Dr. Seltzberg asked defendant about his right to remain silent, Dr. Seltzberg testified that defendant repeated the right but could not explain its meaning. Dr. Seltzberg testified that defendant has the capacity to learn the meaning of the *Miranda* rights over time. Dr. Seltzberg testified that it is her understanding that defendant's comprehension of

*Miranda* rights increased by being in custody and speaking with other detainees, attorneys, and doctors.

¶ 22    Dr. Seltzberg testified that defendant did not know what to do in making the decision to allow a videotaped confession because he was not familiar with murder cases like he was with drug cases. Dr. Seltzberg testified that she found it significant that defendant would not ask for a lawyer if he was caught with drugs because it would "do [him] no good" but "if he didn't have drugs on him, then asking for a public defender might be a good idea."

¶ 23    Dr. Seltzberg testified that, in her opinion, although defendant showed some understanding of his rights, he did not understand them at the time of his arrest and that "he continues to reveal impaired understanding of these rights even at this time."

¶ 24    Dr. Dawna Gutzmann performed an evaluation of defendant on August 25, 2003. Dr. Gutzmann testified that she reviewed the reports created by Drs. Heinrich and Seltzberg, defendant's student records, probation records, police reports, a transcript of the videotaped confession, and a criminal history record before evaluating defendant. Dr. Gutzmann testified that she did not view the video because she did not have the time.

¶ 25    When Dr. Gutzmann asked defendant how he arrived at his decision to agree to a videotaped confession, defendant responded that "the public defender named Nate came in talking to me." Upon cross-examination, Dr. Gutzmann testified that defendant responded correctly when he defined a State's Attorney's role as "try to find you guilty." However, Dr. Gutzmann added that when she asked defendant to define the role of an assistant State's Attorney, defendant responded that, "they never said nothing about no assistant." Dr. Gutzmann further testified that when she asked defendant whether an individual can request an attorney during questioning, even if he cannot afford one, defendant's response was, "I don't know if you can ask. Maybe you can. I don't know."

¶ 26    Dr. Gutzmann opined that defendant did not adequately understand his *Miranda* rights because he did not fully comprehend his right to an attorney and that his conduct was consistent with mild mental retardation.

¶ 27    Drs. Heinrich, Seltzberg, and Gutzmann all agreed that defendant was not malingering during their evaluations.

¶ 28    The State presented no expert testimony. However, the State presented testimony from Area 3 Chicago police detectives Robert Jellen and Steven Schorsch.

¶ 29    Detective Jellen testified that he and his partner, Detective Mark Czworniak, spoke with defendant at defendant's home at about 1:50 p.m. on November 3, 2001, and that he asked defendant to accompany them to the Area 3 Division police station. At approximately 2:20 p.m. on November 3, 2001, Detective Jellen read the *Miranda* rights to defendant from the Fraternal Order of Police book before speaking with defendant about the victim's death. Detective Jellen testified that defendant responded "yes" when Detective Jellen asked him if he understood each *Miranda* right.

¶ 30    Upon cross-examination, Detective Jellen testified that he did not recall inquiring about defendant's educational background nor did he make any attempt to determine whether defendant could read.

¶ 31    Detective Schorsch testified that he met defendant on November 3, 2001, at approximately 7 p.m. along with his partner, Detective Solbolewski. Detective Schorsch testified that he advised defendant of his *Miranda* rights, explained each one, and asked defendant if he understood each right. Detective Schorsch testified that defendant responded "yes" to indicate that he understood each *Miranda* right. Detective Schorsch testified that he took defendant to Detective Kevin Howley at approximately 8:30 p.m. on November 3, 2001, for a polygraph examination, which was not performed. At approximately 10:15 p.m., Detective Schorsch met with defendant in the presence of Detective Howley and defendant demonstrated how he struck the victim.

¶ 32    Detective Schorsch testified that he was also present when defendant met with ASA Richard Nathaniel. Detective Schorsch testified that ASA Nathaniel introduced himself to defendant and informed defendant that he was a prosecutor and not his attorney and then informed defendant of his *Miranda* rights. Detective Schorsch also testified that ASA Nathaniel explained the difference between a prosecutor and defense attorney to defendant and that defendant indicated that he understood the difference. However, upon cross-examination, Detective Schorsch testified that his report does not indicate that ASA Nathaniel explained the difference between the roles of a State's Attorney and a public defender. Detective Schorsch testified that at approximately 6:53 a.m. on November 4, 2001, defendant was videotaped as he confessed to the murder of the victim.

¶ 33    The trial court denied defendant's motion to suppress, stating that the opinions of the three experts were "significantly defective."

¶ 34    The trial court found Dr. Heinrich's opinion to be defective because: (1) Dr. Heinrich did not review defendant's criminal history or the police report; (2) the court disagreed with Dr. Heinrich's opinion that the videotaped confession was stilted and formatted and possibly rehearsed; (3) Dr. Heinrich did not review each of the *Miranda* rights with defendant; and (4) Dr. Heinrich was unaware that defendant was read his *Miranda* rights by Detective Schorsch.

¶ 35    The trial court found Dr. Seltzberg's opinion to be defective because: (1) Dr. Seltzberg's opinions were not objective because she reviewed Dr. Heinrich's report prior to evaluating defendant; (2) Dr. Seltzberg was unaware that defendant was read his *Miranda* rights by Detective Schorsch; and (3) Dr. Seltzberg did not provide any factual basis for her opinion that defendant may have gained understanding of his rights after his arrest from other detainees, doctors, and attorneys.

¶ 36    The trial court found Dr. Gutzmann's opinion to be defective because: (1) Dr. Gutzmann's opinions were not objective because she reviewed Drs. Heinrich's and Selztberg's reports prior to evaluating defendant; and (2) Dr. Gutzmann did not view the videotaped confession.

¶ 37                                              II. Trial

¶ 38    Defendant waived his right to a jury trial on June 13, 2005, and was tried in a bench trial on June 14, 2005.

¶ 39    The State presented testimony from: (1) Trenetta Richardson, the mother of the victim;

(2) Ivan Suarez, a babysitter for the victim; (3) Jeffrey Jones, the boyfriend of Ivan Suarez; (4) Lisa Stevens, the sister of Ivan Suarez; (5) Dr. Nancy Jones, a Cook County deputy medical examiner; (6) Area 3 Chicago police detectives Robert Jellen and Steven Schorsch; (7) polygraph examiner Detective Kevin Howley; and (8) ASA Richard Nathaniel.

¶ 40    Trenetta Richardson testified that in October 2001, she lived with her seven children and that her youngest children were four-month-old twins, Destiny and Dynasty. Richardson testified that she had been in a romantic relationship with defendant since September 2001.

¶ 41    Richardson testified that on October 25, 2001, she left Destiny and Dynasty, and her four-year-old daughter, Kermina, in defendant's care while she went to the store for approximately 15 to 20 minutes. While the children were still in the care of defendant, Richardson testified, her friend Tomeka Garner visited Richardson's home and witnessed the victim crying on a bed and observed that the victim's leg was swollen and that the victim cried when her left leg was moved or touched.

¶ 42    Richardson testified that upon her return home, Garner and defendant informed her that Kermina was jumping on the bed and jumped on the victim's leg. Upon observing that the victim cried when her leg was touched, Richardson testified, she took the victim to the emergency room of Illinois Masonic Hospital, the victim was diagnosed with a fractured leg, and after it was placed in a cast, the victim was released from the hospital.

¶ 43    Richardson testified that on November 1, 2001, she spent the day with defendant and left Ivan Suarez, a friend and previous babysitter, to care for her children. Richardson testified that Jeffery Jones, Ivan's boyfriend, and Lisa Stevens, Ivan's sister, were also present in Richardson's home during this time. Richardson testified that when she and defendant returned to her home, she did not immediately enter the home, but waited to pay Suarez outside. After returning home, Richardson testified, defendant informed her that the victim's face was red and bruised. Richardson immediately ran outside to fetch Suarez, who informed her that he did not injure the victim. Richardson testified that she then gave Children's Tylenol to the victim and placed a cold-compress on the victim's face, and the victim slept normally throughout that night.

¶ 44    Richardson testified that, on November 2, 2001, she left the victim and the victim's sister in defendant's care while she went to Radio Shack. Richardson testified that the twins were sleeping when she left and were still sleeping when she returned about an hour later. Richardson testified that Kemin Washington, the father of two of Richardson's children, and Marcus Allen, defendant's cousin, visited Richardson's home around 8 or 9 p.m.

¶ 45    Richardson testified that around this time, she checked on the twins and observed that the victim was not breathing. Richardson testified that she then called for an ambulance and she and Marcus Allen unsuccessfully attempted to revive the victim through cardiopulmonary resuscitation.

¶ 46    Richardson testified that after the paramedics arrived and carried her and the victim to the Illinois Masonic Hospital, the victim was pronounced dead.

¶ 47    Richardson testified that on November 2, 2001, defendant did not accompany Richardson to the hospital and did not offer an explanation to Richardson for why the victim stopped breathing.

¶ 48    Suarez testified that on November 1, 2001, he handed the victim to defendant inside Richardson's home, that the victim did not have any visible injuries to her face at that time, and that after handing the victim to defendant, he went outside to meet with Richardson. Suarez testified that he did not witness Lisa or Jeff harming the victim during this time.

¶ 49    Jones testified that on November 1, 2001, he was never alone with the victim. Jones and Stevens testified that, on November 1, 2001, they did not witness Suarez hit the victim nor did either of them hit the victim.

¶ 50    However, in a report stipulated to by both parties and submitted by Jackie Johnson, a Department of Children and Family Services (DCFS) employee, Rickeya, Richardson's seven-year-old daughter, told Johnson that she told her mother that Suarez slapped the victim and told the victim to "shut up" on November 1, 2001.

¶ 51    Medical examiner Nancy Jones testified that she performed an autopsy on the victim and found that the victim had multiple bruises and injuries. During this autopsy, Jones testified that she found rib fractures that could have occurred a week or two prior to the victim's death, that the victim's leg fracture was the result of child abuse and could not be the result of a child jumping on the victim's leg, and that the victim died from blunt force head trauma consistent with someone hitting the victim's head into a door.

¶ 52    Detective Robert Jellen testified that he met with medical examiner Nancy Jones to review her autopsy and that as a result of that conversation, the victim's death became a homicide investigation. Detective Jellen testified that he then met with defendant and Marcus Allen, defendant's cousin, and asked them to accompany him to Area 3 to speak about the victim's death. Detective Jellen then stated that he read defendant his *Miranda* rights from the Fraternal Order of Police book and that defendant agreed to waive those rights and speak with the detective.

¶ 53    Detective Steven Schorsch testified that he also informed defendant of his *Miranda* rights when he spoke with defendant at approximately 7 p.m. on November 3, 2001. Detective Schorsch then took defendant to Detective Kevin Howley, a polygraph officer, around 9 p.m. on November 3, 2001.

¶ 54    Detective Howley testified that he informed defendant of his *Miranda* rights upon meeting him. Detective Howley testified that defendant told him three different versions of what occurred with the victim on November 2, 2001. Detective Howley testified that he told Detective Schorsch what defendant had said and he and Detective Schorsch informed defendant that they did not believe defendant's explanations based on the autopsy report.

¶ 55    Defendant then told Detective Schorsh and Detective Howley that he just "snapped" while he was playing video games when the victim awoke, refused to drink the milk he offered her, and would not stop crying. In response to the victim's cries, he hit the victim's head into a door frame three times and returned her to her swing. When the victim resumed crying, defendant admitted punching the victim in the ribs three times until she stopped crying, and then he returned her to her swing. After defendant made his statement, defendant requested to meet with Trenetta Richardson to apologize and did so.

¶ 56    ASA Nathaniel testified that he met with defendant shortly after he concluded his interview with Detective Schorsch at 1:30 a.m. on November 4, 2001. ASA Nathaniel

testified that he advised defendant of his *Miranda* rights and that defendant stated that he understood each right. ASA Nathaniel then stated that he asked Detective Schorsch to leave the room and asked defendant about his treatment by the police. ASA Nathaniel testified that defendant stated that he was treated well and had no problems with his treatment by the police. ASA Nathaniel testified that he then took a consented-to videotape statement of defendant's confession at approximately 6:50 a.m. Defendant did not confess to breaking the victim's leg on October 25, 2001. ASA Nathaniel testified that in his interactions with defendant, he did not experience any difficulty in communication.

¶ 57    After the State rested, the trial court denied defendant's motion for a directed finding.

¶ 58    The parties stipulated to: (1) the reports of Jackie Johnson, a DCFS employee who interviewed three of Richardson's children for suspicion of child abuse following the victim's death; and (2) the testimony of Drs. Seltzberg and Gutzmann from the hearing on the motion to suppress. In Johnson's report, Johnson indicated Kermina admitted to jumping on the victim's leg while the victim was on the bed and Johnson determined that Kermina broke the victim's leg.

¶ 59    The defense presented Dr. Heinrich as an expert witness. Dr. Heinrich testified that defendant had an IQ of 64, which qualified him as mentally retarded, and that defendant had limited vocabulary and intellectual abilities. Dr. Heinrich testified that based on his observations of defendant, he would expect defendant to have low frustration tolerance levels and a lack of ability to think things through, look at implications, and weigh consequences and outcomes. However, Dr. Heinrich did note that because someone is mentally retarded does not necessarily mean that he cannot understand right from wrong or function in society.

¶ 60    Defendant did not testify on his own behalf.

¶ 61                           III. Conviction and Sentencing

¶ 62    The trial court found defendant guilty of one count of aggravated battery to a child for the incident on October 25, 2001, when the victim suffered a broken leg, and guilty of one count of first degree murder for the incident on November 2, 2001, when the victim died from blunt force trauma injuries to the head. On August 30, 2005, defendant was sentenced to two concurrent sentences of 25 years in the Illinois Department of Corrections.

¶ 63                           IV. Direct Appeal

¶ 64    On direct appeal, defendant claimed that: (1) the trial court erred in denying his motion to suppress his confession because his low IQ prevented him from intelligently waiving his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); (2) the State's evidence was insufficient to prove the requisite mental state for first degree murder beyond a reasonable doubt and, as such, his first degree murder conviction should be reduced to battery or, alternatively reduced to an involuntary manslaughter conviction because the prosecution only proved that he caused physical pain; (3) the aggravated battery conviction should be reduced to battery because the State failed to prove that he committed aggravated battery to a child because the victim only sustained a broken leg; and (4) the trial court erred in sustaining the

State's objection when defense counsel asked Dr. Heinrich whether defendant, with his intellectual limitations, could have foreseen the implications of striking the victim. The State addressed these claims and also argued that the trial court erred in sentencing defendant to concurrent sentences when consecutive sentences are mandatory.

¶ 65    On December 24, 2009, we affirmed defendant's convictions, vacated the order of concurrent prison terms, and remanded for resentencing to consecutive prison terms. *People v. Stephens*, Nos. 1-05-3365, 1-05-3366 cons. (unpublished order under Supreme Court Rule 23).

¶ 66    On March 24, 2010, defendant's petition for leave to appeal to the Illinois Supreme Court was denied. *People v. Stephens*, 236 Ill. 2d 538 (2010) (table). In the petition for leave to appeal, defendant argued that the trial court erred in ruling that the experts' opinions were defective because it is improper for one expert witness to review another expert's report and that Dr. Gutzmann's opinion was undermined by her failure to view the videotaped confession. The petition for leave to appeal made no mention of defendant's claim that his low IQ prevented him from waiving his *Miranda* rights.

¶ 67    On remand, on June 9, 2010, the trial court, in the absence of defendant and his counsel, resentenced defendant to two consecutive 25-year sentences in the Illinois Department of Corrections. The trial court stated that defendant was absent and that "for both the cases the Appellate Court mandate has been issued and the mandate–and the mandamus *** shall be spread of record on each of the cases. The mittimus is correct."

¶ 68                                    V. Postconviction Proceedings

¶ 69    On September 20, 2010, defendant filed a *pro se* postconviction petition claiming that: (1) the trial court erred in failing to order a fitness hearing where there was a *bona fide* doubt as to defendant's fitness to stand trial; (2) trial counsel was ineffective for failing to request a fitness hearing; and (3) appellate counsel was ineffective for failing to properly include all the issues raised on direct appeal in his petition for leave to appeal where the failure to preserve these issues results in waiver.

¶ 70    On December 14, 2010, the trial court summarily dismissed defendant's postconviction petition. The court found that defendant's claims were conclusory in nature, not supported by any documentation, and that the claim of ineffective assistance of appellate counsel in not raising the issue of trial counsel's incompetence was based on a nonmeritorious issue.

¶ 71    This appeal now follows.

¶ 72                                    ANALYSIS

¶ 73    On appeal, defendant claims that his postconviction petition should not have been dismissed at the first stage because he stated the gist of several constitutional claims: (1) the trial court erred in not ordering a fitness evaluation *sua sponte*, (2) trial counsel was ineffective for failing to request a fitness evaluation, and (3) appellate counsel was ineffective for failing to raise a certain claim in defendant's petition for leave to appeal to the Illinois Supreme Court. Additionally, defendant argues that his sentence is void because the

trial court failed to afford defendant a new sentencing hearing prior to imposing consecutive sentences, as we ordered when we remanded the case to the trial court on direct appeal. We consider each of defendant's arguments in turn.

¶ 74                            I. Stages of a Postconviction Proceeding

¶ 75        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2000)) provides a means by which a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006) (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005)). To be entitled to postconviction relief, a defendant must show that he or she has suffered a substantial deprivation of his or her federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. 725 ILCS 5/122-1(a) (West 2000); *Pendleton*, 223 Ill. 2d at 471 (citing *Whitfield*, 217 Ill. 2d at 183).

¶ 76        In noncapital cases, the Act provides for three stages. *Pendleton*, 223 Ill. 2d at 471-72. At the first stage, the trial court has 90 days to review a petition and may summarily dismiss it, if the trial court finds that the petition is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2000); *Pendleton*, 223 Ill. 2d at 472. The Illinois Supreme Court has held that, at this first stage, the trial court evaluates only the merits of the petition's substantive claim, and not its compliance with procedural rules. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). If the trial court does not dismiss the petition within that 90-day period, the trial court must docket it for further consideration. 725 ILCS 5/122-2.1(b) (West 2000); *Pendleton*, 223 Ill. 2d at 472.

¶ 77        At the first stage, the trial court "examines the petition independently, without input from the parties." *People v. Brown*, 236 Ill. 2d 175, 184 (2010) (citing *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). The petition's allegations "must be taken as true and liberally construed." *Brown*, 236 Ill. 2d at 193. Additionally, "[i]n considering the petition, the trial court may examine the court file of the criminal proceeding, any transcripts of the proceeding, and any action by the appellate court." *Brown*, 236 Ill. 2d at 184 (citing 725 ILCS 5/122-2.1(c) (West 2006)).

¶ 78        The issue at this first stage is whether the petition presents an "arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. A claim completely contradicted by the record is an example of an indisputably meritless legal theory. *Hodges*, 234 Ill. 2d at 16. "Fanciful factual allegations include those that are fantastic or delusional." *Hodges*, 234 Ill. 2d at 17.

¶ 79        In the case at bar, defendant's petition was summarily dismissed at the first stage. However, if it had proceeded to the second stage, the Act provides that counsel may be appointed for defendant, if defendant is indigent. 725 ILCS 5/122-4 (West 2000); *Pendleton*, 223 Ill. 2d at 472. After an appointment, Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984) requires the appointed counsel: (1) to consult with petitioner by mail or in person; (2) to examine the record of the challenged proceedings; and (3) to make any amendments that are "necessary" to the petition previously filed by the *pro se* defendant. *Perkins*, 229 Ill. 2d

at 42. Our supreme court has interpreted Rule 651(c) also to require appointed counsel "to amend an untimely *pro se* petition to allege any available facts necessary to establish that the delay was not due to the petitioner's culpable negligence." *Perkins*, 229 Ill. 2d at 49.

¶ 80    The Act provides that, after defense counsel has made any necessary amendments to the petition, the State may move to dismiss it. *Pendleton*, 223 Ill. 2d at 472 (discussing 725 ILCS 5/122-5 (West 2000)). See also *Perkins*, 229 Ill. 2d at 43. If the State moves to dismiss, the trial court may hold a dismissal hearing, which is still part of the second stage. *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998). A trial court is foreclosed "from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding." *Coleman*, 183 Ill. 2d at 380-81.

¶ 81    At a third-stage evidentiary hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence," and "may order the petitioner brought before the court." 725 ILCS 5/122-6 (West 2000).

¶ 82    In the case at bar, defendant asks us to reverse the trial court's dismissal of his petition as frivolous and remand for second-stage proceedings. The question of whether a trial court's summary first-stage dismissal was in error is purely a question of law, which an appellate court reviews *de novo*. *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010); see also *Pendleton*, 223 Ill. 2d at 473. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 83                                II. Lack of Notarization

¶ 84    Initially, prior to reaching the merits of defendant's claims, the State argues that we should uphold the trial court's dismissal of defendant's petition because defendant failed to verify his petition by notarized affidavit. Section 122-1(b) of the Act requires that "[t]he proceeding shall be commenced by filing with the clerk of the court in which the conviction took place a petition (together with a copy thereof) verified by affidavit." 725 ILCS 5/122-1(b) (West 2008). "Unlike the section 122-2 affidavit, which shows that the allegations can be objectively and independently corroborated, the verification affidavit requirement of section 122-1, 'like all pleading verifications, confirms that the allegations are brought truthfully and in good faith.' " *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 21 (quoting *People v. Collins*, 202 Ill. 2d 59, 67 (2002)). In the case at bar, defendant filed an affidavit stating that "the content[s] of the Petition as filed are true and correct in both substance and fact," but the affidavit was not notarized. The State claims that the lack of notarization is fatal to defendant's petition, primarily relying on the Second District Appellate Court's decision in *People v. Carr*, 407 Ill. App. 3d 513, 516 (2011). We do not find the State's argument persuasive.

¶ 85    The First District has rejected this argument at least three times, and the Fourth District has also agreed that a lack of notarization does not justify dismissal at the first stage. See *People v. Parker*, 2012 IL App (1st) 101809, ¶¶ 74-77; *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 72; *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 34; *People v. Terry*, 2012 IL App (4th) 100205, ¶¶ 22-23. "Simply stated, since an unnotarized verification affidavit cannot render a petition frivolous or patently without merit, it cannot be condoned as a

-12-

proper basis for first-stage dismissal of a postconviction petition." *Henderson*, 2011 IL App (1st) 090923, ¶ 34. We have also noted that "the purposes of the Act and section 122-2.1 would be hindered by preventing petitions which are neither frivolous nor patently without merit from proceeding to the second stage due to the technicality at issue" (*Henderson*, 2011 IL App (1st) 090923, ¶ 35) and have pointed out that at the second stage, the State will have the opportunity to object to the lack of notarization, and the petitioner's appointed counsel will be able to assist in obtaining notarization. *Parker*, 2012 IL App (1st) 101809, ¶ 75; *Wilborn*, 2011 IL App (1st) 092802, ¶ 72; *Henderson*, 2011 IL App (1st) 090923, ¶ 35.

¶ 86    In the case at bar, we see no reason to depart from our established precedent and, accordingly, proceed to the merits of defendant's claims.

¶ 87                                III. Fitness Evaluation

¶ 88    Defendant's first arguments concern the lack of a fitness evaluation prior to trial. Defendant argues that the testimony of the mental health experts during the suppression hearing that his low IQ prevented him from understanding his *Miranda* rights was sufficient to raise a *bona fide* doubt as to his fitness for trial and, consequently, the lack of a fitness evaluation denied defendant his constitutional right to a fair trial. Defendant claims that the trial court erred in failing to order a fitness evaluation *sua sponte* and that trial counsel was ineffective for failing to request a fitness evaluation. Since both of these issues are issues that could have been raised on direct appeal, defendant also claims that his appellate counsel was ineffective for failing to raise them.

¶ 89                                    A. Trial Court

¶ 90    We first consider defendant's claim that the trial court should have ordered a fitness hearing *sua sponte*. A defendant is presumed fit to stand trial (725 ILCS 5/104-10 (West 2000)) and is entitled to a fitness hearing "only when a *bona fide* doubt of his fitness to stand trial or be sentenced is raised." *People v. McCallister*, 193 Ill. 2d 63, 110 (2000) (citing *People v. Johnson*, 183 Ill. 2d 176, 193 (1998)); *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991). A defendant is unfit "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2000). "Because it is a violation of due process to convict a defendant who is mentally unfit to stand trial, a judge has a duty to order a fitness hearing *sua sponte* once facts are brought to the judge's attention that raise a *bona fide* doubt of the accused's fitness to stand trial or be sentenced." *McCallister*, 193 Ill. 2d at 110-11 (citing *People v. Murphy*, 72 Ill. 2d 421, 430 (1978)). Thus, since this appeal arises from the first-stage dismissal of defendant's postconviction hearing, we consider whether there is an arguable basis in fact or law that defendant raised a *bona fide* doubt of his fitness to stand trial such that the trial court had a duty to order a fitness hearing *sua sponte*. We agree with the trial court that there is not.

¶ 91    "Relevant factors which a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include a defendant's 'irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial.' [Citation.] The representations of

-13-

defendant's counsel concerning the competence of his client, while not conclusive, are another important factor to consider." *Eddmonds*, 143 Ill. 2d at 518 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). However, "there are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Eddmonds*, 143 Ill. 2d at 518 (quoting *Drope*, 420 U.S. at 180). Accordingly, the question of whether a *bona fide* doubt of fitness exists is a fact-specific inquiry. *People v. Tapscott*, 386 Ill. App. 3d 1064, 1077 (2008).

¶ 92    The fact that a defendant suffers from mental disturbances or requires psychiatric treatment does not automatically result in a *bona fide* doubt of the defendant's fitness. *Eddmonds*, 143 Ill. 2d at 519. "Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound." *People v. Easley*, 192 Ill. 2d 307, 320 (2000) (citing *People v. Murphy*, 72 Ill. 2d 421, 432-33 (1978)); see also *Eddmonds*, 143 Ill. 2d at 519-20. Moreover, "[t]he question of fitness may be fluid. Someone who appeared to have difficulty understanding his plight in 2007 may be rational in 2008." *People v. Weeks*, 393 Ill. App. 3d 1004, 1010 (2009).

¶ 93    In the case at bar, defendant argues that the opinions of Dr. Heinrich, Dr. Seltzberg, and Dr. Gutzmann "should have been sufficient evidence under these circumstances to raise a legitimate doubt as to [defendant's] capacity to meaningfully participate in his defense and cooperate with counsel." We do not find defendant's argument persuasive.

¶ 94    Defendant's entire argument relies upon the opinions of the three expert witnesses, who all testified during the suppression hearing about defendant's ability to waive his *Miranda* rights. However, the evaluations were conducted several years prior to trial and concerned defendant's ability to waive *Miranda* rights, not his fitness to stand trial; indeed, defendant acknowledges that the experts "never evaluated [defendant] specifically for fitness."

¶ 95    The question of whether a defendant is fit to stand trial is a different inquiry than whether the defendant is able to waive his or her *Miranda* rights. See *People v. Rockamann*, 79 Ill. App. 3d 575, 580-81 (1979). For instance, in *Rockamann*, the appellate court rejected a defendant's argument that it was an "unexplainable inconsistency" that he was found competent to stand trial but his confession was suppressed because he did not knowingly understand and waive his *Miranda* rights. *Rockamann*, 79 Ill. App. 3d at 580. The court stated that the question in determining fitness to stand trial was whether the defendant was able to understand the nature and purpose of the proceedings and assist in his own defense (*Rockamann*, 79 Ill. App. 3d at 579), but the standard for determining whether a confession was admissible is "whether or not the statement has been made 'freely, voluntarily and without compulsion or inducement of any sort,' or whether the defendant's will was overborne at the time he confessed," which required consideration of the totality of the circumstances, including details of the interrogation as well as the characteristics of the accused (internal quotation marks omitted) (*Rockamman*, 79 Ill. App. 3d at 581 (quoting *People v. Hester*, 39 Ill. 2d 489, 497 (1968))). The court noted that "these two criteria contrast strikingly" and that "[a] finding of unfitness under one test does not mandate such a conclusion under the other." *Rockamann*, 79 Ill. App. 3d at 581.

¶ 96     Here, as noted, the experts evaluated defendant for his competency to waive his *Miranda* rights, not for his competency to stand trial. Additionally, the trial court rejected the experts' opinions, a decision that we affirmed on appeal. *Stephens*, slip op. at 19. Defense counsel at oral argument drew a distinction between rejecting the experts' conclusions that defendant could not waive his *Miranda* rights and rejecting the experts' medical findings. However, we do not find this distinction persuasive. It is clear from examining the record that the trial court rejected the basis for the experts' opinions, as well as their ultimate conclusions. As we noted on direct appeal:

> "The trial court noted the second and third opinions were not independent of, and appeared to be based on, the first by Dr. Heinrich. The trial court further found certain expert conclusions unsupported by objective data, including Saltzberg's belief that defendant was so vulnerable to suggestion that his waiver of rights was unreliable. Heinrich admittedly overlooked the evidence of defendant's criminal history. Gutzmann's willingness to espouse an expert opinion without having viewed the most revealing evidence–the confession itself–fatally compromised her testimony." *Stephens*, slip op. at 19.

Thus, the only information in the experts' opinions that is arguably relevant to defendant's fitness was the fact that he was mentally disabled and had problems with his communication and comprehension several years before trial. However, as noted, "[a] defendant can be fit for trial although his or her mind may be otherwise unsound." *Easley*, 192 Ill. 2d at 320 (citing *Murphy*, 72 Ill. 2d at 432-33).

¶ 97     Here, the record does not reveal, and defendant does not provide, any other basis that would arguably raise a *bona fide* doubt of his fitness. There is no indication of any " 'irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial' " (*Eddmonds*, 143 Ill. 2d at 518 (quoting *Drope*, 420 U.S. at 180)) that would support a finding of unfitness. There is no affidavit or indication from his trial counsel that defendant was unable to understand the nature and purpose of the proceedings and assist in his own defense. At oral argument, defense counsel claimed that, in part, the lack of any evidence in the record as to defendant's demeanor was because defendant did not testify or otherwise make statements on the record. However, during trial, at least four witnesses–Richardson, Detectives Jellen and Howley, and ASA Nathaniel–testified to not knowing that defendant had intellectual disabilities, despite conversations with defendant. The record also indicates that defendant had extensive experience with the criminal justice system, having been arrested nine times with two convictions. Furthermore, there is nothing in the record demonstrating that trial counsel had concerns about defendant's fitness. See *Eddmonds*, 143 Ill. 2d at 518 ("The representations of defendant's counsel concerning the competence of his client, while not conclusive, are another important factor to consider.").

¶ 98     We cannot find that the mere fact that experts testified that defendant was mentally disabled and had trouble communicating and understanding his *Miranda* rights provides an arguable basis that there was a *bona fide* doubt of defendant's fitness such that the trial court would have been required to order a fitness hearing *sua sponte*. Accordingly, defendant's postconviction petition was properly dismissed at the first stage.

¶ 99                           B. Ineffective Assistance of Trial Counsel

¶ 100        Defendant also argues that his trial counsel was ineffective for failing to request a fitness
             hearing. The Illinois Supreme Court has held that, to determine whether a defendant was
             denied his or her right to effective assistance of counsel, an appellate court must apply the
             two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*,
             225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting
             *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions
             constituted errors so serious as to fall below an objective standard of reasonableness; and (2)
             absent these errors, there was a reasonable probability that his trial would have resulted in
             a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466
             U.S. at 687-94).

¶ 101        Under the first prong of the *Strickland* test, the defendant must prove that his counsel's
             performance fell below an objective standard of reasonableness "under prevailing
             professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004).
             Under the second prong, the defendant must show that, "but for" counsel's deficient
             performance, there is a reasonable probability that the result of the proceeding would have
             been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable
             probability that the result would have been different is a probability sufficient to undermine
             confidence in the outcome–or put another way, that counsel's deficient performance rendered
             the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*,
             225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's
             performance.

¶ 102        To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill.
             2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be
             disposed of because the defendant suffered no prejudice, we need not determine whether
             counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We
             do not need to consider the first prong of the *Strickland* test when the second prong cannot
             be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 103        Combining the standard for a first-stage summary dismissal with the standard for
             ineffective assistance of counsel, our supreme court has held that a postconviction petition
             alleging ineffective assistance of counsel may not be summarily dismissed, if: "(i) it is
             arguable that counsel's performance fell below an objective standard of reasonableness and
             (ii) it is arguable that defendant was prejudiced." *Petrenko*, 237 Ill. 2d at 497 (citing *People
             v. Golden*, 229 Ill. 2d 277, 283 (2008)).

¶ 104        In the case at bar, like in his argument concerning the trial court's failure to order a
             fitness hearing *sua sponte*, defendant's ineffectiveness claim focuses on the experts' opinions
             about defendant's ability to waive his *Miranda* rights. Defendant primarily relies on the
             Fourth District Appellate Court's decision in *People v. Shanklin*, 351 Ill. App. 3d 303 (2004),
             in support of his argument. In that case, the defendant pled guilty to attempted murder in the
             middle of a bench trial. Included in his presentence investigation report was information that
             the defendant had been hospitalized three times for mental health problems and that tests
             completed during his hospital stays indicated that the defendant was mildly mentally retarded

and had significant problems retaining and receiving verbal information. *Shanklin*, 351 Ill. App. 3d at 304. Later, the defendant filed a postconviction petition alleging that he was unfit when he entered his guilty plea; the defendant also alleged that his trial counsel was ineffective for failing to raise the issue of the defendant's fitness before the trial court despite the fact that the defendant had informed trial counsel of his mental health history. *Shanklin*, 351 Ill. App. 3d at 304-05. The defendant attached copies of his psychological evaluation from Hartgrove Hospital to the petition. The evaluation included the facts that the defendant was admitted to Hartgrove Hospital on three separate occasions when he was 15 and 16 years old for "violent and disruptive behavior" and was assessed by psychiatric and social work staff, who concluded that the defendant had a low IQ in the mildly mentally retarded range, had a history of mental health treatment, and had difficulty receiving and retaining verbal information. *Shanklin*, 351 Ill. App. 3d at 306. The defendant's postconviction petition was dismissed at the first stage. *Shanklin*, 351 Ill. App. 3d at 305.

¶ 105 On appeal, the appellate court reversed, finding that the defendant had stated the gist of a constitutional claim that he was unable to understand the nature of the proceedings and his trial counsel was ineffective in failing to request a fitness hearing. *Shanklin*, 351 Ill. App. 3d at 308. The court noted that "[g]enerally, limited intellectual ability, without more, does not render a defendant unfit [for] trial," but "[t]his case, however, involved more than just low mental capacity." *Shanklin*, 351 Ill. App. 3d at 306. The court pointed to the defendant's mental health history and the report indicating that the defendant had problems with verbal communication. *Shanklin*, 351 Ill. App. 3d at 306. The court stated, "[t]he report indicates defendant may not have been able to fully comprehend what was being verbally communicated to him either by counsel or the trial court as to the consequences of a guilty plea in this case" and noted that the defendant's hospital record suggested that he "was likely to avoid academic situations that would cause him shame or embarrassment. It is not idle speculation to consider whether defendant may have answered questions from the court in a way that would avoid exposing his intellectual deficit." *Shanklin*, 351 Ill. App. 3d at 307. Consequently, the court found that a fitness hearing should have been held. *Shanklin*, 351 Ill. App. 3d at 308.

¶ 106 We do not agree with defendant that the Fourth District's decision in *Shanklin* compels the same result in the case at bar. As noted, the question of whether a *bona fide* doubt of fitness exists is a fact-specific inquiry. See *Tapscott*, 386 Ill. App. 3d at 1077 ("Whether a *bona fide* doubt of a defendant's fitness exists involves a fact-specific inquiry."). Here, there was no guilty plea and defendant's sole basis for claiming unfitness was the opinions of the three experts who testified at his suppression hearing and who did not discuss or opine to his fitness. As we have discussed, the experts' opinions alone do not provide an arguable basis for finding a *bona fide* doubt of defendant's fitness. Furthermore, unlike in *Shanklin*, defendant here was not hospitalized for mental health problems and was only evaluated in the context of his ability to waive his *Miranda* rights. Like in his argument concerning the trial court, there is no indication that defendant exhibited any conduct to his trial counsel that would have supported a request for a fitness evaluation; instead, defendant again focuses solely on the experts' opinions. We cannot find that the failure of trial counsel to request a fitness hearing based on these opinions arguably fell below an objective standard of

reasonableness and accordingly affirm the trial court's summary dismissal of defendant's postconviction petition.

¶ 107   Moreover, we cannot find that defendant was arguably prejudiced by trial counsel's failure to request a fitness hearing. Our supreme court has discussed the standard to be applied in determining whether the failure to request a fitness hearing is prejudicial:

> "[T]o establish that his trial counsel's alleged incompetency prejudiced him within the meaning of *Strickland*, defendant must show that facts existed at the time of his trial that would have raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceeding and to assist in his defense. Defendant is entitled to relief on this post-conviction claim only if he shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been appraised of the evidence now offered." *Easley*, 192 Ill. 2d at 318-19.

In the case at bar, as noted, defendant's ineffectiveness argument depends solely on the experts' opinions. The same evidence was relied upon in defendant's argument that the trial court should have *sua sponte* ordered a fitness hearing. There, we concluded that the experts' opinions, alone, were not sufficient to arguably raise a *bona fide* doubt of defendant's fitness because the opinions did not consider his fitness to stand trial. Thus, there is no arguable basis for concluding that the trial court would have ordered a fitness hearing if trial counsel had requested one, and defendant's ineffectiveness claim fails on the prejudice prong as well.

¶ 108                      C. Ineffective Assistance of Appellate Counsel

¶ 109   Defendant also claims that his appellate counsel was ineffective for failing to raise the issues concerning defendant's fitness on direct appeal. Ineffective assistance of appellate counsel is determined under the same standard as a claim of ineffective assistance of trial counsel. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001) (citing *People v. West*, 187 Ill. 2d 418, 435 (1999)). Appellate counsel is not required to raise every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit. *Edwards*, 195 Ill. 2d at 163-64 (citing *People v. Johnson*, 154 Ill. 2d 227, 236 (1993)). Accordingly, unless the underlying issue has merit, there is no prejudice from appellate counsel's failure to raise an issue on appeal. *Edwards*, 195 Ill. 2d at 164 (citing *People v. Childress*, 191 Ill. 2d 168, 175 (2000)).

¶ 110   In the case at bar, we have found that neither of defendant's arguments concerning his fitness has merit. Consequently, there was no prejudice from appellate counsel's failure to raise the issues on appeal.

¶ 111                      D. Trial Court's Dismissal Order

¶ 112   As a final matter, we consider defendant's argument that the trial court did not read the trial record before summarily dismissing defendant's postconviction petition and instead "merely relied on the trial judge's comments regarding the expert testimony as stated in the appellate court's order from [defendant's] direct appeal." Defendant claims this is particularly problematic since the judge considering the postconviction petition was not the

same judge that presided over defendant's trial. Furthermore, defendant argues that even if the trial court read the pretrial testimony of the experts, an evidentiary hearing was required for the trial court to make credibility determinations about the experts instead of relying on the trial judge's credibility determination that the expert opinions were " 'significantly defective.' "

¶ 113      As noted, at the first stage of a postconviction petition, the trial court "examines the petition independently, without input from the parties." *Brown*, 236 Ill. 2d at 184 (citing *Gaultney*, 174 Ill. 2d at 418). "At the summary dismissal stage, a petitioner's allegations must be taken as true and liberally construed." *Brown*, 236 Ill. 2d at 193. Additionally, "[i]n considering the petition, the trial court may examine the court file of the criminal proceeding, any transcripts of the proceeding, and any action by the appellate court." *Brown*, 236 Ill. 2d at 184 (citing 725 ILCS 5/122-2.1(c) (West 2006)).

¶ 114      In the case at bar, there is no evidence that the trial court failed to read the trial record and only relied on the trial judge's comments quoted in our earlier order, and in the absence of such evidence, we will presume that the trial court properly examined the record. See *People v. Leach*, 2011 IL App (1st) 090339, ¶ 38 (the trial court is presumed to know and follow the law, unless the record indicates otherwise). Additionally, we agree with the State that the trial court did not make credibility determinations about the experts. The trial court's dismissal of defendant's postconviction petition was based on its determination that defendant's claims were conclusory. The trial court also noted that an evaluation of whether a defendant is competent to stand trial and an evaluation of whether a defendant is able to understand his *Miranda* rights are two different questions. Neither of these conclusions requires a credibility determination. Finally, the portion of the dismissal order quoted by defendant in his brief is a recitation of the trial judge's reasoning for denying defendant's motion to suppress; it in no way suggests that the trial court used that reasoning in making a credibility determination. At most, it is a statement that the trial judge found the experts' opinions unhelpful. Accordingly, we affirm the trial court's summary dismissal of defendant's postconviction petition.

¶ 115                    IV. Petition for Leave to Appeal

¶ 116      Defendant next argues that his appellate counsel was ineffective for failing to raise the issue of defendant's ability to waive his *Miranda* rights when appellate counsel filed a petition for leave to appeal to the supreme court.

¶ 117      Although the parties do not discuss the issue, we first consider whether defendant had a right to effective assistance of counsel for the purpose of filing a petition for leave to appeal to the supreme court. " '[T]he right to effective assistance of counsel is dependent on the right to counsel itself.' " *People v. James*, 111 Ill. 2d 283, 291 (1986) (quoting *Evitts v. Lucey*, 469 U.S. 387, 396 n.7 (1985)). However, "the federal constitution provides no right to appointed counsel to obtain discretionary appellate review." *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 72 (2005) (citing *Ross v. Moffitt*, 417 U.S. 600, 619 (1974)). Thus, a defendant is not deprived of his constitutional right to effective assistance of counsel when appellate counsel fails to seek discretionary review. *James*, 111 Ill. 2d at 291. Additionally, the United

States Supreme Court has held that since there is no constitutional right to counsel, a defendant is not deprived of effective assistance of counsel if appellate counsel fails to file an application for discretionary review in a timely manner. *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (*per curiam*). Thus, even if appellate counsel's performance in preparing the application falls below minimum standards of performance, there is no deprivation of the constitutional right to counsel because there is no such right to counsel in filing the application. *Chalk v. Kuhlmann*, 311 F.3d 525, 529 (2d Cir. 2002).

¶ 118    In the case at bar, defendant argues that appellate counsel was ineffective for failing to raise an argument in his petition for leave to appeal to the supreme court. However, since the appeal to the supreme court was a discretionary appeal and not one as of right, defendant did not have the right to counsel in filing his petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Oct. 15, 2007) (unless it is appealable as of right, "[w]hether [a petition for leave to appeal] will be granted is a matter of sound judicial discretion"). See also *Chalk*, 311 F.3d at 529 (noting that the application for leave to file an appeal to the state's highest court is not a part of the direct appeal to the intermediate court but is the first step of the subsequent discretionary appeal). If defendant did not have the right to counsel, appellate counsel could not have been ineffective in failing to preserve all of defendant's claims. See *Wainwright*, 455 U.S. at 587-88 ("Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely."). Accordingly, we affirm the dismissal of defendant's postconviction petition.

¶ 119                                        V. Sentencing

¶ 120    Defendant's final claim is that the consecutive sentences imposed by the trial court on remand are void and must be vacated because the trial court did not conduct a new sentencing hearing as we instructed. On direct appeal, we found that, although the trial court had imposed concurrent sentences, consecutive sentences were mandatory, making the sentencing order void. *Stephens*, slip op. at 27. We vacated the concurrent sentences and remanded the case to the trial court for the imposition of consecutive sentences. *Stephens*, slip op. at 28. We stated: "We affirm the judgment of the circuit court, but vacate the concurrent prison terms and remand for resentencing to consecutive prison terms as mandated by section 5-8-4(a)(1) of the Code (730 ILCS 5/5-8-4(a)(1) (West 2000)). It is within the trial court's discretion to determine the length of each sentence to be imposed, within the permissible statutory sentencing range. [Citation.]" *Stephens*, slip op. at 30.

¶ 121    On remand, the trial court, in the absence of defendant, stated in its entirety:

"These are the cases of Nathaniel Stephens. The defendant is not in court. For both the cases the Appellate Court mandate has been issued and the mandate–and the mandamus, excuse me, shall be spread of record on each of the cases. The mittimus is corrected.

Defendant sentenced to 25 years consecutive and it is nunc pro tunc to August 30th, 2005. Actually, let me phrase it this way: One case is 28427 and the other case is 28428. On 27 the sentence is 25 years Illinois Department of Corrections. On 28428 the sentence

-20-

is 25 years Illinois Department of Corrections consecutive to 01 CR 28427. Both sentences are nunc pro tunc to 8-30-05. Let me just add this little part too, on 28427, that sentence is on Count 3. And it will be off call."

The State does not dispute that the above did not constitute a new sentencing hearing as we ordered. However, the State argues that we should not remand the case for resentencing for a number of reasons: (1) the issue has been waived because defendant failed to include it in his postconviction petition and raised it for the first time during the instant appeal; (2) the issue has been waived because the claim does not involve a constitutional violation but only a statutory violation; and (3) waiver aside, a failure to comply with the statutory sentencing requirements made the sentence voidable, not void, and such an attack is not available on collateral review.

¶ 122    Defendant, on the other hand, acknowledges that the issue was not included in his postconviction petition, but argues that a void sentence may be challenged at any time, even on appeal from the dismissal of a postconviction petition, and may be challenged even where the sentence was entered in violation of a statutory requirement.

¶ 123    Despite the parties' arguments concerning whether the sentence is void or voidable, we find that a different argument raised by defendant is dispositive of the issue. As defendant notes, in failing to conduct a new sentencing hearing, the trial court failed to obey the mandate of a reviewing court. "[A] trial court must obey the clear and unambiguous directions in a mandate issued by a reviewing court." *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982); see also *Bond Drug Co. of Illinois v. Amoco Oil Co.*, 323 Ill. App. 3d 190, 196 (2001); *Puritan Finance Corp. v. Gumdrops, Inc.*, 101 Ill. App. 3d 888, 891 (1981) ("where a direct order with instructions has been issued by this court, a trial judge has no discretion in the matter and must follow the mandate"). Since we have the inherent authority to compel compliance with our orders, we again vacate defendant's sentences and remand the cause to the trial court for resentencing. See *Sanders v. Shephard*, 163 Ill. 2d 534, 540 (1994) ("Vital to the administration of justice is the inherent power of courts to compel compliance with their orders." (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966))). We caution the trial court that section 5-5-3(d) of the Unified Code of Corrections (Code) (730 ILCS 5/5-5-3(d) (West 2004)) provides in relevant part:

"In any case in which a sentence originally imposed is vacated, the case shall be remanded to the trial court. The trial court shall hold a hearing under Section 5-4-1 of the Unified Code of Corrections which may include evidence of the defendant's life, moral character and occupation during the time since the original sentence was passed. The trial court shall then impose sentence upon the defendant."

Accordingly, on remand, the trial court must hold a new sentencing hearing, in compliance with both our mandate and the requirements of section 5-5-3(d) of the Code.

¶ 124                                      CONCLUSION

¶ 125    We affirm the trial court's dismissal of defendant's postconviction petition at the first stage, since defendant did not demonstrate an arguable basis in law or fact that (1) the trial court erred in failing to order a fitness hearing *sua sponte*, (2) trial counsel was ineffective

in failing to request a fitness hearing, (3) appellate counsel was ineffective for failing to raise the issue of defendant's fitness on direct appeal, or (4) appellate counsel was ineffective for failing to include defendant's claim concerning the waiver of his *Miranda* rights in his petition for leave to appeal to the supreme court. We vacate defendant's consecutive 25-year sentences and remand the cause for resentencing in compliance with our mandate in *Stephens*, slip op. at 30, and section 5-5-3(d) of the Code.

¶ 126      Affirmed; cause remanded for resentencing.