2020 IL App (1st) 162186-U

No. 1-16-2186

Order filed February 6, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 15119 |
| | ) | |
| DWOND DONAHUE, | ) | Honorable |
| | ) | William G. Lacy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The summary dismissal of defendant's *pro se* postconviction petition is affirmed over his contention that the petition presented an arguable claim of ineffective assistance of trial, posttrial, and appellate counsel.

¶ 2    Defendant Dwond Donahue appeals *pro se* from the summary dismissal of his *pro se* petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). On appeal, defendant contends that the circuit court erred when it dismissed his petition because it presented an arguable claim that he was denied the effective assistance of

trial, posttrial, and appellate counsel where trial and posttrial counsel failed to investigate a certain witness and information from police reports, and appellate counsel failed to challenge the sufficiency of the evidence and the State's misconduct during closing argument. We affirm.

¶ 3     Following a jury trial where defendant was represented by private counsel, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) in the shooting death of Lawaide Labon on June 14, 2008, and sentenced to 72 years in prison. We detailed the evidence in our order on direct appeal (*People v. Donahue*, 2014 IL App (1st) 120163), and relate only those facts necessary to the disposition of the current appeal.

¶ 4     At trial, Tiffany Labon testified that Lawaide was her cousin, and that on June 14, 2008, they both attended a family party.[1] Around 11:20 p.m., Tiffany was standing on the street talking with her uncle, Daiquiri Collins, and another man, "Red," who was there with his dog. At one point, a man arrived, pointed a firearm at the dog, and said to "shut the f*** dog up or I'll shoot it." Tiffany observed the man's face and identified defendant in court as that person. Another person approached, grabbed defendant, and took him "across the street or down the street." Two minutes later, Lawaide drove up and double-parked his vehicle. When Lawaide exited the vehicle, defendant returned, pushed him, and "stepped up in his face asking who is you?" Defendant and Lawaide began "tussling" and defendant reached for his firearm. At this point, Collins pulled Tiffany away. She then heard three gunshots. When she turned around, Lawaide was on the ground and defendant was entering a van. On June 15, 2008, Tiffany viewed a photo array at the police station. The photo array contained someone who "looked like" defendant but

---

[1] To avoid confusion, we will refer to Tiffany Labon and Lawaide Labon by their first names.

was not defendant. On June 25, 2008, Tiffany viewed a photo array and identified defendant. She later identified defendant in a lineup.

¶ 5     During cross-examination, Tiffany testified that she did not know Red's name. She was not sure what the man with the firearm was wearing, how tall he was, or how much he weighed. He was, however, taller than her. Tiffany had never encountered the man before. The man with the firearm had a mustache and a "little bit" of a beard, but she did not tell the police that because they did not ask.

¶ 6     In October 2009, defense investigator Mark Sanders visited Tiffany at her home. She denied telling Sanders that a detective pointed to defendant's picture in the photo array while asking whether "this [was] him." Rather, she testified that the detective pointed to defendant after she identified him. During their conversation, Sanders wrote a two-page statement which Tiffany initialed and signed. Defense counsel reviewed the statement with Tiffany and she acknowledged telling Sanders that while she viewed the photo array, a detective pointed to defendant and asked if "this [was] him," and that she was unsure "if the shooter was one of these pictures." Tiffany also told Sanders that one of the detectives repeatedly pointed at defendant's picture and said "is this him," and that she felt that she was "supposed" to identify defendant. This statement was admitted into evidence.

¶ 7     Collins, Tiffany's and Lawaide's uncle, testified consistently with Tiffany that they were outside around 11 p.m. with a group that included a man with a dog. Collins did not know this man. Eventually only the dog owner, Tiffany, and Collins remained. A man Collins had never met before arrived. Collins identified defendant in court as this man. Defendant reached behind his back, drew a firearm, and pointed it at the dog. Less than a minute later, a van arrived and

double-parked. Defendant approached the van and stated, "these guys are punks here and they're not going to do anything." Lawaide then parked behind the van, and walked toward Collins. Defendant approached Lawaide and bumped his nose. Lawaide bumped back, and the men began fighting. Defendant again drew a firearm and fired. Collins heard two shots and observed Lawaide collapse. Defendant entered the van and drove away. The next day, Collins went to a police station and viewed two photo arrays. He did not identify anyone; defendant's photograph was not in either array. On June 17, 2008, officers visited Collins at his home and showed him another photo array. Collins identified defendant as the shooter, and later identified him in a lineup.

¶ 8 During cross-examination, Collins testified that the shooter was "clean cut" and did not have a mustache or a beard. He acknowledged that the photograph of defendant included in the photographic array depicted defendant with a mustache and beard. On redirect, Collins explained that "clean cut" meant a "thin" beard and mustache.

¶ 9 The State entered a stipulation that an assistant medical examiner, if called, would testify that there were two gunshot wounds to Lawaide's body and that he died from those wounds.

¶ 10 Chicago police detective Gregory Jones testified that he investigated the shooting. Officers recovered three discharged 9-millimeter shell casings from the pavement and identified two eyewitnesses, Tiffany and Collins. During cross-examination, Jones testified that he also spoke to the man with the dog, Gregory Howard.

¶ 11 Chicago police officer Joseph Wagner testified that defendant was arrested after a foot chase on July 9, 2008.

¶ 12    Chicago police detective Mark Vanek testified that on June 14, 2008, he spoke with Tiffany and Collins, and compiled two photo arrays to show them. First, he showed the two arrays to Tiffany, who circled a photo and stated that it looked like the shooter, but "she would not be able to say that was the person." Tiffany further stated that she would need a physical lineup to be sure. Next, he showed the arrays to Collins, who was unable to make an identification. Neither photo array contained defendant's photo. During cross-examination, Vanek testified that he never learned the name of the man with the dog and did not speak to him.

¶ 13    The State then recalled Jones, who testified that he was present on July 10, 2008, when Howard, Tiffany, and Collins viewed a lineup that included defendant. Tiffany and Collins identified defendant. As soon as Collins entered the room, he hit his fist against the two-way mirror and said "number two. That's the guy that did it."

¶ 14    Chicago police detective Roberto Garcia testified that during the investigation, he learned about a potential third witness, "the dog walker," Howard. Garcia also went to Collins's home and showed him a photo array. Collins identified defendant as the shooter. By June 23, 2008, Garcia interviewed Howard. By June 25, 2008, Howard and Tiffany had viewed a photo array. Tiffany identified defendant in the photo array. In the months before trial, the State asked Garcia to help locate Howard, but Garcia could not find him. During cross-examination, Garcia testified that he had two addresses for Howard, both of which were near the scene of the shooting.

¶ 15    In closing argument, the State argued, in pertinent part, that Tiffany and Collins identified defendant as the shooter. The defense noted the "differences" in their testimony and argued there was no way to know what Howard "would have said on the witness stand." The defense further argued that Tiffany could not recall what the shooter was wearing, and noted that when she

viewed the photo array a detective pointed at defendant's photo and asked if "this" was him. Further, Collins contradicted himself about whether "clean cut" included a mustache. In rebuttal, the State argued, in pertinent part, that the defense theory was that there was a "police conspiracy" to frame defendant. The defense objected and the court overruled the objection. The State further argued that the detectives had no motive to ask Tiffany to identify defendant. The State finally argued that the armed forces do not fight to protect "our society" so that a "murderer could walk the streets," and that Lawaide would have been safer in the military than on the street "with guys like defendant walking around."

¶ 16    The jury found defendant guilty of first degree murder and that during the offense defendant personally discharged a firearm that proximately caused the death of another person.

¶ 17    Defendant obtained new posttrial counsel, who filed a motion for a new trial alleging that the State did not prove defendant guilty beyond a reasonable doubt, a newly discovered witness could exculpate defendant, trial counsel was ineffective when he failed to interview and present the testimony of certain alibi witnesses, and the State's closing argument was improper.

¶ 18    At the hearing on defendant's motion, Angelina Donahue, defendant's sister, testified that on the day of the shooting, she and her son accompanied defendant and his girlfriend, Wynter Williams, to Garfield Park and then to Buckingham Fountain.[2] A photographer took photographs of the group standing in front of the fountain. Angelina identified the photographs, which were date-stamped. The group left downtown around 11:30 p.m. and arrived at her father's house between midnight and 12:30 a.m. Defendant and Williams dropped Angelina and her son off at

---

[2] To avoid confusion, we will refer to Angelina Donahue by her first name.

their home around 1 or 1:30 a.m. Angelina told trial counsel prior to trial about the photographs, but counsel told her not to worry and that he had "this."

¶ 19    During cross-examination, Angelina testified the group probably left the fountain around 10:30 p.m. She first told trial counsel about the alibi on a three-way phone call with counsel and defendant in March 2010. Initially, Angelina could not find the photographs, but defendant knew in December 2009 that she had found them. During redirect, Angelina testified that trial counsel "blue [*sic*] us off" when they discussed the photographs and said, "I got this. Didn't worry about that. I got that."

¶ 20    Lawrence Murphy, who knew defendant from the neighborhood, testified that he was on the porch with his mother between 11:15 and 11:30 p.m. on the night of the shooting when he observed a light blue van drive by. He then observed an arm "stick out [of] the passenger window" and heard two gunshots. He observed two people in the van, and neither was defendant. Murphy did not speak to the police that night because he did not "feel the need for it" and was "pretty sure" that someone else would because there were so many people "out there." He did not know anyone's "real" or "government name" in order to identify people who could corroborate his testimony.

¶ 21    Murphy moved away for college in August 2008. In November or December 2010, he saw Angelina at a gas station and learned that defendant was charged with the offense and "awaiting trial." However, Murphy could not get "in touch" with defendant's legal team, lost touch with Angelina, and "just couldn't do much." When he encountered Angelina in 2011 and learned about the "mistrial," he told her that he would do "whatever" he could because he knew defendant was not the shooter. When he was not at school, Murphy lived in the same house from

which he observed the shooting. Murphy testified that he did not call the police, a defense attorney, or a State's attorney, did not go to a courthouse, and admitted that he had a prior conviction for possession of heroin with intent to deliver.

¶ 22    Williams testified that she dated defendant in 2008. She testified consistently with Angelina that on June 14, 2008, their group went to Garfield Park, then Buckingham Fountain, left downtown around 11:30 p.m., and finally dropped off Angelina and her son at their home. Williams identified two dated photographs of the group in front of Buckingham Fountain. Before they left downtown, Williams used her cell phone to take a video of the group walking, which was published. Because it was dark, the faces in the video were not clear. However, the date on the footage was June 14, 2008, and the time, which was in 24-hour time, was "2204." Williams never spoke with trial counsel. When she attended the last day of trial, she realized the significance of June 14.

¶ 23    Defendant testified that he and Williams picked up his sister and nephew, then went to Garfield Park, downtown, and later, to his father's house. He identified two dated photographs from the downtown outing. At one point, Williams used her cell phone to make a video recording. Since January 2009, defendant had been incarcerated at Cook County jail and trial counsel never visited him. Sometime between December 2009, when defendant learned that trial counsel was "on the case," and March 8, 2010, the first "set trial date," defendant told counsel about the photographs.[3] Prior to this conversation, defendant mailed counsel a packet of information, in which he told counsel the names, addresses, and phone numbers of the people he was with on June 14, 2008. When he talked to counsel, he asked why counsel had not called

_____

[3] Defendant testified that he retained trial counsel in August 2009 to represent him in an unrelated case and at some point, trial counsel began to represent defendant in the instant case as well.

Angelina and Williams, and counsel responded that defendant did not need any witnesses. He did not tell counsel the content of the witnesses' possible testimony. Defendant only ever talked to trial counsel in the "bullpen" at the courthouse.

¶ 24    During cross-examination, defendant testified that he told trial counsel about his alibi "in the bullpen." When defendant asked trial counsel why he had not called the witnesses, counsel stated defendant did not need any witnesses because the State could not prove its case. Angelina was wrong when she testified that the three-party conference call occurred in March 2010; rather, it was between December 2009 and the "first set trial date." Defendant had pled guilty to vehicular hijacking in 1994, residential burglary in 2001, and driving under the influence of alcohol and unlawful use of a weapon in 2007. Trial counsel told defendant that it would not be a "good idea" for defendant to testify. Defendant admitted that his alibi, his presence at his father's house, placed him five blocks from the scene of the shooting. Upon questioning by the court, defendant stated that he was initially appointed a public defender and that he did not tell her about his alibi witnesses.

¶ 25    The State then called trial counsel, who did not "recall" defendant informing him of an alibi. The defense theory at trial was that the identifications were made after a party and the offense was at night, such that the identifications would not withstand cross-examination. Counsel noted that of the three eyewitnesses to the shooting, Howard did not appear at trial, Tiffany recanted her identification, and only Collins consistently identified defendant. During trial, counsel felt very strongly that "we were on our way [to] winning." During cross-examination, counsel agreed that the defense theory was "reasonable doubt." Counsel discussed the theory with defendant in the lockup on "various occasions." He did not recall receiving a

packet in the mail from defendant or whether he visited defendant in jail. Counsel received letters from defendant but did not recall how many. He also did not recall discussing an alibi defense, the lakefront photographs, or Williams's cell phone footage.

¶ 26    At the close of testimony, the defense asked for a new trial or a reversal of defendant's conviction based, in pertinent part, on trial counsel's failure to present "corroborative evidence" that placed defendant somewhere else on the evening of the shooting. The defense also argued that Murphy's testimony qualified as newly discovered evidence. The State responded that trial counsel did a "great job" and took advantage of the fact that Howard stopped "showing up in court." The State further argued that Murphy had "no rational explanation" for why he "sat" on his information.

¶ 27    After hearing argument, the trial court denied defendant's motion. The court noted that defendant impeached Angelina's testimony regarding the March 2010 conversation. The court further noted that defendant testified that he communicated his alibi to trial counsel through a package or letter, found it "strange" that defendant never told his public defender about his alibi, and concluded it was "wholly incredible" that trial counsel would ignore evidence of an alibi. Regarding Murphy, the court determined that his testimony was not newly discovered evidence when Murphy claimed that he knew that defendant was not the shooter and told Angelina before trial. The court further found that Murphy's testimony was "wholly incredible" and did not "fit" the facts of how the shooting occurred, as described by the other witnesses. The court finally noted that the alibi witnesses contradicted each other. For example, although Williams testified that she did not know the significance of the date of the offense until the last day of trial,

defendant testified that Williams knew she was a witness and that her name was given to trial counsel as an alibi witness.

¶ 28    Following a hearing, defendant was sentenced to 47 years in prison for first degree murder plus a 25-year sentencing enhancement because during the course of the offense he personally discharged a firearm that proximately caused the death of another person.

¶ 29    On direct appeal, defendant contended that he was not proven guilty beyond a reasonable doubt and that the State's comments during closing argument and at the posttrial hearing deprived him of a fair trial and hearing. Specifically, defendant contended that the State committed misconduct during closing argument when it stated that Lawaide was safer in a war zone and that the defense raised a conspiracy theory by arguing that the police framed defendant, and at the posttrial hearing when it asserted facts not in evidence, that is, when it asked defendant if he would be "surprise[d]" that an alibi was not mentioned in certain phone calls. We affirmed. See *People v. Donahue*, 2014 IL App (1st) 120163.

¶ 30    In April 2016, defendant filed a *pro se* postconviction petition alleging, in pertinent part, that he was denied the effective assistance of trial, posttrial, and appellate counsel. Specifically, the petition alleged that defendant was denied the effective assistance of trial counsel when counsel failed to investigate Howard, who would have testified that defendant never threatened him or his dog and only identified defendant based upon instructions from the investigating detectives. The petition alleged that Howard "indicated" that Detective Garcia "instructed" him to identify defendant as the shooter "despite [Howard] affirmative[ly] informing detectives" that defendant was not the shooter, and that Howard identified defendant as the shooter "falsely" at Garcia's behest.

¶ 31    The petition also alleged that if trial and posttrial counsel had the police reports attached to the petition, they were deficient for failing to investigate the reports and discover the identity of the witnesses. The petition further alleged that posttrial counsel was ineffective when he failed to challenge trial counsel's failure to investigate police reports which "supported the defense theory at trial as well as an alibi," and when posttrial counsel failed to object to the State's mischaracterization of Murphy's testimony. The petition finally alleged that appellate counsel was deficient for failing to challenge the sufficiency of the evidence, the State's "repeated" misconduct during closing argument, and the trial court's rejection of Murphy's testimony. Defendant attached his affidavit, police reports, and portions of the trial transcripts.

¶ 32    In his affidavit, defendant averred that prior to trial, trial counsel stated that there were three State's witnesses, Tiffany, Collins, and Howard, and that police reports indicated that Howard was identified by police as "the guy with the dog." Defendant further averred that counsel told him that Howard was at the courthouse during a recess and shortly before trial began, but that counsel did not intend to present Howard at trial. Defendant averred that he had received information from a person who "asserted" he was Howard. Defendant next averred that Howard stated that a Hispanic detective instructed him to falsely identify defendant as the shooter, that Howard initially refused to do so, and that he saw someone who was not defendant shoot Lawaide. Defendant finally averred that he was unable to secure a "sworn statement" from Howard, but that Howard said he would provide information to a court-appointed investigator.

¶ 33    The police reports included, *inter alia*, three partially redacted lineup advisory forms, which stated that three people identified defendant as the shooter, a report that indicated that defendant denied involvement in the shooting and stated that he was "kicking it with some girls"

on the night of the shooting" and was "everywhere; [but] I wasn't on the west side," and a report that stated that "witnesses" and "anonymous witnesses" stated that a vehicle approached Lawaide and "fired several shots" at him.

¶ 34    The circuit court summarily dismissed the petition as frivolous and patently without merit. Defendant filed a timely *pro se* notice of appeal.

¶ 35    On appeal, defendant contends that the circuit court erred when it summarily dismissed his *pro se* postconviction petition because it set forth arguable claims that he was denied the effective assistance of trial, posttrial, and appellate counsel.

¶ 36    The Act provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. 725 ILCS 5/122-1 *et seq*. (West 2016). A proceeding initiated under the Act is "not a substitute for a direct appeal, but rather is a collateral attack on a prior conviction and sentence." *People v. Davis*, 2014 IL 115595, ¶ 13. The Act allows inquiry into constitutional issues arising in the original proceeding that were not raised and could not have been adjudicated on direct appeal. *Davis*, 2014 IL 115595, ¶ 13. Issues raised and decided on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *Davis*, 2014 IL 115595, ¶ 13.

¶ 37    At the first stage of proceedings under the Act, a defendant files a petition, which the circuit court independently reviews and, taking the allegations as true, determines whether it is frivolous or is patently without merit. *People v. Tate*, 2012 IL 112214, ¶ 9. A petition should be summarily dismissed as frivolous or patently without merit only when it has no arguable basis in either fact or law. *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). A petition lacks an arguable basis

in fact or law when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. Fanciful factual allegations are those which are "fantastic or delusional," and an indisputably meritless legal theory is one that is "completely contradicted by the record." *Hodges*, 234 Ill. 2d at 16-17. We review the summary dismissal of a postconviction petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 38     "At the first stage of proceedings under the Act, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). If we may dispose of defendant's claim on the basis that he suffered no prejudice, we need not address whether counsel's performance was objectively unreasonable. *People v. Salas*, 2011 IL App (1st) 091880, ¶ 91. Broad conclusory allegations of ineffective assistance of counsel are not sufficient to avoid a summary dismissal. *People v. Delton*, 227 Ill. 2d 247, 258 (2008).

¶ 39     Initially, we reiterate that any claim raised and decided on direct appeal is barred by *res judicata*. *Davis*, 2014 IL 115595, ¶ 13. Here, defendant contended on direct appeal that he was not proven guilty beyond a reasonable doubt and that the State committed misconduct during closing argument. Consequently, those claims are barred by *res judicata* in this postconviction proceeding.

¶ 40     To the extent that defendant argues in the instant appeal that he was denied the effective assistance of appellate counsel because counsel did not challenge trial counsel's failure to object to certain remarks during closing argument, we disagree. In our previous decision, we found that those remarks either did not tip the scales of justice against defendant, were not so serious that

they affected the fairness of his trial (*Donahue*, 2014 IL App (1st) 120163, ¶¶ 112-17), or were harmless beyond a reasonable doubt (*Donahue*, 2014 IL App (1st) 120163, ¶¶ 118-23). Defendant acknowledges that appellate counsel challenged the remarks at issue on direct appeal, but concludes that because this court found certain remarks were improper (*Donahue*, 2014 IL App (1st) 120163, ¶ 117), appellate counsel erred by not arguing that trial counsel erred by not objecting to those remarks. This argument fails for two reasons. First, although we found that the comments at issue were improper, we determined that they did not tip the scales of justice against defendant or were not so serious that they affected the fairness of his trial. *Donahue*, 2014 IL App (1st) 120163, ¶ 117. In other words, the comments did not prejudice defendant. Second, defendant cannot attempt to relitigate this issue and avoid the bar of *res judicata* by couching it in terms of appellate counsel's ineffectiveness. See *People v. Kimball*, 348 Ill. App. 3d 1031, 1034 (2004) (holding that a postconviction petitioner cannot avoid the procedural bar of *res judicata* by simply rephrasing issues that have already been raised or by "adding an additional allegation that is encompassed by a previously adjudicated issue.").

¶ 41    Defendant further contends that he was denied the effective assistance of counsel when appellate counsel failed to challenge the sufficiency of the evidence before the Illinois Supreme Court, rendering the issue unpreserved for further review in federal court.

¶ 42    In *People v. Stephens,* 2012 IL App (1st) 110296, ¶ 117, this court considered whether a defendant has the right to the effective assistance of counsel for the purposes of filing a petition for leave to appeal to our supreme court. In that case, we noted that because the federal constitution does not provide the right to appointed counsel in discretionary appellate review, a defendant is not deprived of his constitutional right to the effective assistance of counsel when

appellate counsel fails to seek discretionary review. *Stephens,* 2012 IL App (1st) 110296, ¶ 117. In other words, even if appellate counsel is deficient in the filing of an application for discretionary review, "there is no deprivation of the constitutional right to counsel because there is no such right to counsel in filing the application." *Stephens,* 2012 IL App (1st) 110296, ¶ 117. We then determined that because an appeal to our supreme court is a discretionary appeal, the defendant did not have the right to counsel in the filing of his petition for leave to appeal. *Stephens,* 2012 IL App (1st) 110296, ¶ 118 (citing Ill. S. Ct. R. 315(a) (eff. Oct. 15, 2007)). We therefore concluded that if the defendant did not have the right to counsel, appellate counsel could not have been ineffective if counsel failed to preserve all of defendant's claims. *Stephens,* 2012 IL App (1st) 110296, ¶ 118.

¶ 43    Similarly, here, because defendant did not have the right to counsel in the preparation of his petition for leave to appeal, appellate counsel could not have been ineffective based upon the failure to raise a certain claim (*Stephens,* 2012 IL App (1st) 110296, ¶¶ 117-18), and his claim must fail.

¶ 44    Defendant next contends that he was denied the effective assistance of trial counsel when counsel failed to interview and present the testimony of Howard. Defendant argues there was no reason for counsel not to interview Howard, who was an eyewitness and present at some point at the courthouse. Defendant further contends that Howard would have testified that defendant was not the shooter and that officers instructed him to falsely identify defendant. Defendant acknowledges that Howard's affidavit is not attached to the postconviction petition, but argues that defendant's affidavit constitutes "other evidence" under section 122-2 of the Act (725 ILCS 5/122-2 (West 2016)), that he has limited resources due to his incarceration, and that Howard

will only provide information to a court-appointed investigator. The State replies that the record reveals that Howard was not available prior to trial, and, furthermore, defendant's argument that Howard's testimony would have been favorable to the defense is based upon "pure conjecture."

¶ 45    Because most postconviction petitions are drafted by *pro se* defendants, "the threshold for a petition to survive the first stage of review is low." *People v. Allen*, 2015 IL 113135, ¶ 24. The low threshold, however, "does not excuse the *pro se* [defendant] from providing factual support for his claims; he must supply sufficient factual basis to show the allegations in the petition are 'capable of objective or independent corroboration.' " *Allen*, 2015 IL 113135, ¶ 24 (quoting *People v. Collins*, 202 Ill. 2d 59, 67 (2002)).

¶ 46    Section 122-2 of the Act provides that a postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2016). "The purpose of the 'affidavits, records, or other evidence' requirement is to establish that a petition's allegations are capable of objective or independent corroboration." *Hodges*, 234 Ill. 2d at 10. The supporting material must (1) show "the petition's allegations are capable of corroboration" and (2) identify "the sources, character, and availability of evidence alleged to support the petition's allegations." *Allen*, 2015 IL 113135, ¶ 34. Our supreme court has found the failure to attach the necessary supporting material or explain its absence is fatal to a postconviction petition and alone "justifies the petition's summary dismissal." *Collins*, 202 Ill. 2d at 66; see also *Allen*, 2015 IL 113135, ¶ 26 (a postconviction petition that fails to comply with section 122-2 is "substantially incomplete").

¶ 47 Here, defendant argues that his affidavit satisfies the requirements of section 122-2 of the Act because it shows the factual basis of his claim and identifies Howard as the source of evidence to support his claim. We do not find this argument persuasive.

¶ 48 As our supreme court recently explained, when a defendant raises a claim of ineffective assistance of counsel for failing to call a particular witness in a postconviction petition, an affidavit from the proposed witness is not necessarily required to support a claim under section 122-2 of the Act, as long as the claim is supported by the record or other evidence. *People v. Dupree*, 2018 IL 122307, ¶ 34. Despite this requirement, defendant provides no evidence or documentation to support his claim. Without Howard's affidavit, we cannot determine what testimony, if any, he could provide. Although the record indicates that Howard spoke to officers, viewed a lineup, and was present at the courthouse, by the time of trial, his whereabouts were unknown. Specifically, Detective Garcia testified that he was unable to locate Howard at two different addresses. Moreover, although the record reveals that Howard was present at the shooting and viewed a photo array, the record does not indicate the results of the photo array.

¶ 49 Contrary to defendant's argument on appeal, his affidavit summarizing what he believed Howard's testimony would show does not demonstrate that the allegation in the petition is capable of objective or independent corroboration, nor does it establish the availability of supporting evidence. See *Dupree*, 2018 IL 122307, ¶ 34 ("in most cases where [a claim of ineffective assistance based on counsel's failure to investigate and call a witness] is raised, without an affidavit [from the proposed witness], there can be no way to assess whether the proposed witness could have provided evidence that would have been helpful to the defense");

see also *People v. Teran*, 376 Ill. App. 3d 1, 4 (2007) ("common sense dictates that a defendant's own affidavit is not at all objective or independent").

¶ 50    Relying on *People v. Washington*, 38 Ill. 2d 446 (1967), defendant further argues his "lack of funds to hire a private investigator or to obtain the affidavit" is a sufficient explanation for the failure to present Howard's affidavit.

¶ 51    In *Washington*, the defendant, who was serving a 25-year prison term, appealed from the trial court's grant of the State's motion to dismiss his postconviction petition. *Washington*, 38 Ill. 2d at 447-48. In his petition, the defendant alleged, *inter alia*, that counsel told him and his sister that the State and the court agreed that if he pleaded guilty, he would be sentenced to 14 years in prison. Accordingly, " 'relying on the promise of his attorney,' " the defendant entered a guilty plea. *Washington*, 38 Ill. 2d at 448. Before the supreme court, the State argued that dismissal was proper because the petition "lacked supporting affidavits." *Washington*, 38 Ill. 2d at 448.

¶ 52    Our supreme court began by reviewing the contents of the defendant's petition, noting that it "stated why affidavits were not attached," identified each person involved by name, and was verified. *Washington*, 38 Ill. 2d at 449. The court next reviewed the contents of the State's motion to dismiss, as well as the State's arguments before the trial court, and found the State could not "depart from the position it took in the trial court" and "argue [before our supreme court] that the petition was properly dismissed for want of supporting affidavits." *Washington*, 38 Ill. 2d at 449. In other words, the State could not attack the sufficiency of the supporting documents for the first time on appeal when it had not done so in the trial court. The court turned to the merits of the claim, found that defendant was entitled to an evidentiary hearing, and reversed and remanded for further proceedings. *Washington*, 38 Ill. 2d at 449-51.

¶ 53    We are unpersuaded by defendant's argument that *Washington* stands for the proposition that because he is incarcerated and indigent, his own affidavit swearing to the facts that Howard would have testified to at trial satisfies the requirements of section 122-2 of the Act. Rather, the *Washington* court, after reviewing the contents of the defendant's petition and the State's written and oral arguments in support of its motion to dismiss, determined that the State had forfeited its argument concerning compliance with section 122-2 by failing to raise it before the trial court. We disagree that incarceration, on its own, is a sufficient explanation for failing to supply supporting documentation under section 122-2 of the Act in light of the fact that relief under the Act is available only to people "imprisoned in the penitentiary" (725 ILCS 5/122-1(a) (West 2016)). See also *People v. Harris*, 2019 IL App (4th) 170261, ¶ 19 ("Because the Act contemplates defendants seeking postconviction relief are likely to be imprisoned, we hold imprisonment, by itself, cannot excuse a defendant's failure to attach supporting material to a postconviction petition.").

¶ 54    Here, defendant has not described any efforts to obtain Howard's affidavit. Rather, defendant averred that he received information from a person who "asserted" he was Howard and that defendant was unable to secure a "sworn statement" from Howard, but that Howard would provide information to a court-appointed investigator. Because defendant failed to attach the necessary supporting material to establish that his allegation regarding Howard is "capable of objective or independent corroboration" (*Hodges*, 234 Ill. 2d at 10), summary dismissal of this claim was proper.

¶ 55    Defendant's final contentions concern the posttrial hearing. He argues that (1) posttrial counsel was deficient for not challenging the State's "mischaracteriz[ation] of Murphy's

testimony" at the posttrial hearing regarding when Murphy encountered Angelina, which caused the trial court to conclude that Murphy's testimony was not new evidence; (2) appellate counsel was ineffective for not challenging posttrial counsel's failure to object; and (3) trial and posttrial counsel were deficient for failing to investigate his statement in a police report that he was "with some females" on the night of the shooting. According to defendant, these errors permitted the trial court to conclude the alibi evidence offered at the posttrial hearing was a recent fabrication.

¶ 56    At the posttrial hearing, Murphy testified that he observed the shooting and knew defendant was not the shooter, but did not contact police because other people were present, and he assumed that one of them would speak to officers. After encountering Angelina in November or December 2010 and learning defendant was "awaiting trial," Murphy did not contact the police, trial counsel, or the prosecutors. During argument, the State argued that Murphy had "no rational explanation" for why he did not tell anyone that defendant was not the shooter.  The trial court found that Murphy's testimony was not new evidence because Murphy knew that defendant was not the shooter and shared this information with Angelina before trial. Moreover, the trial court found Murphy's testimony incredible and noted that his recitation of the facts of the shooting was completely different than that of the other witnesses. Thus, while Murphy was mistaken as to when defendant's trial took place, that is, defendant was found guilty on November 4, 2010, the trial court discounted Murphy's testimony because he claimed to have known that defendant was not the shooter since the night of the shooting yet never told anyone and his description of the shooting was completely different than that of the other witnesses. Consequently, defendant has not established that the outcome of the posttrial hearing would have been different but for posttrial counsel's failure to object to the State's mischaracterization of

Murphy's testimony, and defendant's claim of ineffective assistance of posttrial counsel fails. *Salas*, 2011 IL App (1st) 091880, ¶ 91. Additionally, because defendant has not established that he was denied the effective assistance of posttrial counsel, he has also failed to establish that he was denied the effective assistance of appellate counsel for failing to raise this issue on direct appeal. See *People v. Childress*, 191 Ill. 2d 168, 175 (2000) (unless the underlying issue is meritorious, a defendant suffers no prejudice if counsel does not raise it on appeal).

¶ 57    Defendant finally contends that he was denied the effective assistance of trial and posttrial counsel because they did not investigate (1) defendant's statement, contained in a certain police report, that he was with "some females" on the night of the shooting in order to support an alibi defense, and (2) another police report which indicates that "witnesses" and "anonymous witnesses" stated that a vehicle approached Lawaide and "fired several shots" at him. Defendant notes that he did not know about the police reports until March 2015, and argues that "if this court believes" that trial and posttrial counsel had the reports then their failure to investigate the contents enabled the trial court to dismiss defendant's alibi as a recent fabrication.[4] We do not find this argument persuasive.

¶ 58    Although defendant testified at the posttrial hearing that he told trial counsel about his alibi and that he was with Angelina and Williams, trial counsel denied that defendant ever said he had an alibi or gave him the women's names. Further, while posttrial counsel did not mention

---

[4] We are unpersuaded by defendant's additional speculative argument that the fact that he did not know about the police reports until March 2015 means that the State "suppressed" the documents. Defendant has not presented either an affidavit from trial or posttrial counsel stating that counsel did not receive the documents, and the mere fact that defendant did not previously know of the documents' existence does not automatically lead to the conclusion that the State did not comply with all required discovery procedures. An issue that is not clearly defined and sufficiently supported by the record and pertinent legal authority fails to satisfy the requirements of Supreme Court Rule 341(h)(7) and is therefore forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

the police reports at the posttrial hearing, he did present defendant, three other witnesses, and dated photographs in support of an alibi defense at the posttrial motion, and Murphy testified that the shooting was a drive-by.

¶ 59    The record reveals, contrary to defendant's argument, that the trial court rejected defendant's alibi defense at the posttrial hearing because defendant and the witnesses contradicted each other, and because it was incredible that defendant would not tell his public defender about his alibi and that trial counsel would ignore an alibi defense. Moreover, despite the fact that the police reports were not mentioned specifically at the posttrial hearing, their contents, that defendant denied involvement in the shooting because he was with some "females" and that witnesses asserted that the shooting was a drive-by, were presented through witness testimony. Additionally, although defendant testified that he gave trial counsel the names of the potential witnesses, counsel denied that defendant ever mentioned an alibi. Thus, because defendant cannot establish prejudice, his conclusory allegation that he was denied the effective assistance of trial and posttrial counsel when they did not explicitly mention the police reports must fail. See *Delton*, 227 Ill. 2d at 258 (conclusory allegations of ineffective assistance of counsel are not sufficient to avoid summary dismissal). Similarly, defendant's claim of ineffective assistance of appellate counsel also fails because appellate counsel cannot be deemed ineffective for failing to raise a non-meritorious issue on appeal. *Childress*, 191 Ill. 2d at 175.

¶ 60    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 61    Affirmed.