2021 IL App (2d) 190558-U
No. 2-19-0558
Order filed October 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1240 |
| BRYON KEITH CHAMP, | ) ) ) | Honorable Debra D. Schafer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying defendant's request to represent himself at his trial on domestic battery charges. Prior to the court's finding that defendant was unfit, he was outrageously disrespectful to the court and showed both an inability to focus on meaningful issues and a basic misunderstanding of the roles of the court and the defense attorney. Though, after treatment, defendant's behavior improved, he continued to act irrationally and thus raised serious concern about his ability to knowingly and intelligently choose self-representation.

¶ 2    Following a bench trial, defendant, Bryon Keith Champ, was convicted of aggravated

domestic battery (720 ILCS 5/12- 3.3(a-5) (West 2014)). The trial court sentenced him to 12 years'

imprisonment.  Defendant appeals, contending that the trial court erred by refusing to allow him to represent himself.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was indicted twice in this case.  The first indictment, issued in July 2015, charged defendant with one count of aggravated domestic battery (*id.* § 12-3.3(a)(a-5)) and two counts of domestic battery (*id.* § 12-3.2(a)(2)).  The indictment alleged that, on June 12, 2015, defendant grabbed Domminique Lewis and strangled her.  Defendant and Lewis had previously been in a dating relationship.

¶ 5     The trial court initially appointed Assistant Public Defender Brad Fuller to represent defendant.  Later, defendant waived counsel and represented himself at his September 2015 jury trial.

¶ 6     At trial, Lewis testified that the incident occurred in the Brewington Oaks apartment complex where both she and defendant lived.  She confirmed that she had been shown surveillance footage of the incident.  Julie Neibarger, who was employed with the management agency for Brewington Oaks, testified that no additional video of the incident existed.  She explained that her agency typically deletes videos after 30 days and that, because there was no request for preservation, any additional video of the incident was deleted.

¶ 7     Defendant was found guilty.  The trial court reappointed Fuller, who filed a motion for a new trial.  The motion alleged that, prior to electing self-representation, defendant had not been admonished that he was eligible for Class X sentencing as a result of prior convictions.

¶ 8     At a hearing on December 18, 2015, Fuller advised the court that defendant had filed a complaint with the Attorney Registration and Disciplinary Commission (ARDC) against him even though defendant had represented himself at trial.  The trial court tried to determine whether

defendant wanted to again discharge Fuller and proceed *pro se* or proceed with a hearing on the motion Fuller had filed. Defendant continually referred to the surveillance video. Both the court and Fuller repeatedly reminded defendant that the video did not exist. Fuller opined that defendant needed his help but that, because of his mistaken beliefs, defendant refused to talk to him. Addressing Fuller, defendant said, "You abide by what I tell you to do." The court expressed his concern whether defendant was capable of representing himself because "he can't seem to focus on the issues and questions that are put upon him." Ultimately, defendant agreed for Fuller to proceed with the motion for a new trial. The court continued the matter.

¶ 9     On December 31, 2015, status hearing, defendant cited what he claimed were rules requiring Fuller to do whatever defendant wanted him to do. Defendant stated that, if Fuller would not listen to him, he would be better off proceeding by himself. The court advised defendant that Fuller was not obligated to do whatever he was told, especially if it was contrary to his ethical obligations. Defendant continued to argue about the video. Fuller noted that defendant was unable to focus on the pertinent issues, leading Fuller "in the direction of raising a doubt as to his fitness to assist me in his own defense."

¶ 10    The court stated that it would not remove Fuller based on allegations of ineffective assistance. Nevertheless, based on the deteriorating relationship between defendant and Fuller, a private attorney, Gary Pumilia, was court-appointed as new defense counsel. Defendant asserted that Fuller had led him to believe that the motion for a new trial had already been granted. The court did not understand why defendant believed the motion had been granted. The court continued:

> "But you've got to cooperate with [Pumilia], just like you've got to cooperate with everybody. You can't continue to argue with everybody, as far as what's going on.

And understand, just because you want something done does not mean that the attorney is required to do that or is allowed to do that. They have an ethical obligation. If you're asking them to do something that's baseless, they can't do that. Because if they file something that's frivolous, they're subject to sanction—both by the Court and by the ARDC."

¶ 11 On April 12, 2016, the court noted that defendant was filing *pro se* documents despite being represented by counsel. The court allowed Pumilia to withdraw and appointed private attorney Patrick Braun to represent defendant. Referring to one of defendant's *pro se* filings, the court remarked that the evidence at trial showed that the video did not exist. The court noted that "what doesn't exist cannot be produced."

¶ 12 On November 10, 2016, the court granted defendant a new trial, and Braun said that he needed time to prepare. After talking to defendant, and without his objection, Braun agreed that the delay was attributable to the defense. The court noted that the indictment still did not reflect that defendant was subject to Class X sentencing. The court commented that the State would have to decide whether to amend the indictment or reindict. The State replied that it would advise the court of its decision.

¶ 13 On December 19, 2016, Braun asked for a trial date. The parties agreed to a continuance, to which defendant did not object. The parties did not discuss the indictment at this hearing. The court set trial for February 21, 2017.

¶ 14 On February 14, 2017, Braun, without objection from defendant, requested a continuance of the trial date. Braun noted that his relationship with defendant regarding trial strategy and issues had deteriorated. The court commented that, though it had granted a new trial because it had not

admonished defendant about Class X sentencing, the indictment still had not been corrected to reflect defendant's Class X sentencing eligibility.

¶ 15    Braun said that defendant was still insisting that the video was admissible.  The court remarked that the issue of the video had been "exhausted" and that defendant simply was unhappy with the outcome.  Trial was continued to April 17, 2017.  The court admonished the prosecutor, "I want that Bill of Indictment corrected so there's no mistakes."

¶ 16    On April 17, 2017, Braun said that he had filed a motion to dismiss based on a delay in bringing the indictment after defendant was arrested.  The court informed Braun that such a motion would not dispose of the case and that the State could reindict.  Defendant then interjected, claiming that he could not be retried because jeopardy had attached.

¶ 17    The following colloquy ensued:

"THE DEFENDANT: What you mean, jeopardy has not attached?  You are trying me for the same crime that you didn't dismiss.  You supposed to dismiss this Indictment.  Let me bring it to your attention.

THE COURT: Okay. You are represented by counsel.  You are not going to bring anything to my attention.

THE DEFENDANT: My Constitutional right, my freedom of speech, this fucking Indictment is 7-17-15.  I got this on 8 July 15th, '15.  This Indictment is 7 days old.  You supposed to dismiss this Indictment, never supposed to allow this Indictment to continue, period.  When you violated my rights, Supreme Court Rule 401, Section 8, for a lawyer for advice and consultation.  Then I was ineffective of counsel.  All the sudden you want to vacate this Mother fucking Indictment instead of dismissing it, one more Mother fucking rights.

THE COURT: Okay. First of all, this is a court of law.

THE DEFENDANT: I mean I don't give a fuck what—you violated my rights. I have every right to speak.

THE COURT: And if you read the statute that I cited to you, it's not an automatic dismissal. There has to be a motion filed. If it's not filed in a timely manner, it's waived, and even if I grant the motion, you will be held in custody until a new charge can be filed. That's what the law requires. You have not gone to trial on this.

THE DEFENDANT: Multiple prosecution, multiple.

THE COURT: Then you need to look into what jeopardy means.

THE COURT REPORTER: You can't talk at the same time. I can't—

THE COURT: I'm talking now. Jeopardy does not attach on a jury trial until the trial has begun. In your case I granted you a new trial. That does not prevent the State from retrying you.

THE DEFENDANT: Who said I was taking a jury? I'm taking a bench because you have made sure my 6th Amendment right is not violated.

THE COURT: Right now—

THE DEFENDANT: He informed you of that.

THE COURT: I don't have a jury waiver. I have, this case is set for a jury trial.

THE DEFENDANT: No. This is not set for no jury. I'm taking a bench. I already took a jury trial. He was informed of that. And he supposedly let you know that, Wilt. We not going to play these games.

THE COURT: My name is not Wilt.

THE DEFENDANT: Well, Judge Wilt, every time we come in here my Mother fucking rights is violated.

THE COURT: Take him out.

THE GUARD: We will bring him; Bryon, come on.

THE DEFENDANT: What is that shit?

THE COURT: Bring him back, bring him back. I told you before, this is a court of law. You don't use profanity in my courtroom. You sit there, and you be quiet. You do not use profanity in my courtroom. You have cursed in here at least 4 times this morning.

THE DEFENDANT: I cussed plenty of times the other court date when my rights was violated. I had to do that just to get your attention, Wilt.

THE COURT: I'm holding you in contempt of Court.

THE DEFENDANT: I'm already locked up, man. There ain't nothing else you can do, man. I'm already locked up.

THE COURT: That's fine.

I'm imposing 6 months' additional time on you, so you will be held in custody after this case is over with for a period of 6 months.

THE DEFENDANT: Wilt, when you get through—

THE COURT: My name is Judge Wilt.

THE DEFENDANT: No, Wilt to me.

THE COURT: Then take him out.

THE DEFENDANT: I'm going to sue the shit out of—you Mother fucking, when you get through—Tell him to shut up, my Constitutional rights."

¶ 18     At the end of the hearing, the trial court granted the motion to dismiss and noted that it would hold defendant in custody for a specified time in case the State wished to bring a new indictment.

¶ 19     On May 17, 2017, the State brought a new indictment, charging defendant with aggravated domestic battery (720 ILCS 5/12-3.2, 3.3(a-5) (West 2014)), aggravated battery (*id.* § 12-3.05(a)(5)) and battery (*id.* § 12-3.2(a)(2)).  The indictment alleged the same incident on the same date.  On May 19, 2017, the court went over the new charges.  Defendant complained that his issue with Fuller was that he "didn't file what he is supposed to do."  Fuller said that defendant wanted to subpoena the victim's mental health records.  Defendant said that he had a case supporting his position that the records were admissible.  Fuller explained why the case defendant cited was inapposite.

¶ 20     On August 17, 2017, the day defendant's second trial was to start, the court noted that defendant had filed an ARDC complaint against Braun.  The court conducted a *Krankel* hearing. See *People v. Krankel*, 102 Ill. 2d 181, 189 (1984).  Defendant said that he did not want to fire his attorney but just wanted him to "do his job."  Specifically, defendant wanted Fuller to have the complaining witness given a mental health evaluation, to subpoena certain witnesses, and to raise a speedy-trial claim.  The court asked Braun about each allegation.  After explaining to defendant that the attorney makes the final decisions in questions of trial strategy, the court found no significant conflict and ruled that defendant was not entitled to a new attorney.

¶ 21     On August 29, 2017, Braun notified the court that defendant had filed a second ARDC complaint.  The court suggested that defendant be evaluated for fitness.  The following exchange occurred:

"THE DEFENDANT: You're not gonna sit here and violate my Sixth Amendment or my First Amendment rights, and I'm not gonna sit here and let no lawyer violate my Sixth Amendment either. You's the judge. I asked you—and that's your job to make sure my Sixth Amendment is not violated.

THE COURT: And that's what I have been doing by conducting these types of hearings.

THE DEFENDANT: But you allowed the State to use a witness that's incompetent without being violated—without her being evaluated, period.

THE COURT: Okay. You need to understand something—

THE DEFENDANT: (Interrupting) *People v. Dace* that's a Supreme Court case.[1]

THE COURT: I understand—no, it's not.

THE DEFENDANT: Yes, it is.

THE COURT: It's an Appellate Court case.

THE DEFENDANT: That's a Supreme Court case. You violating—you violating the issues; yes, you is. She never been … no doctor, no physician, Rosecrance, no clinic, none of that.

You had no business of lettin' the State put her on the stand and she incompetent.

THE COURT: Okay.

THE DEFENDANT: You know it and they know it. And you try to pretend like you didn't know nothin' about that Victim Impact Statement. His slick ass slid that to Brett (*sic*) Fuller and gave it to me on the way out the door. I know what the fuck be going on

---

[1] Defendant apparently was referring to *People v. Dace*, 114 Ill. App. 3d 908 (1983).

in this courtroom.  You always be violating my constitutional rights, and I told you that. I'm not gonna sit here and let you do it.

THE COURT: Once again, the Court does not have the authority to order a witness to undergo a mental health evaluation.  Whether you agree with it or not, I don't have that authority.

THE DEFENDANT: But I told you before—

THE COURT: So I'm not doing it.

THE DEFENDANT: (Continuing)—we had trial—

THE COURT: Pardon?

THE DEFENDANT: I told you before we even had trial she had them problems.

THE COURT: Okay. And that doesn't change things.  I don't then and I don't now have the authority—

THE DEFENDANT: (Interrupting) You have an incompetent witness up there, Your Honor, incompetent witness.

THE COURT: There has been no—

THE DEFENDANT: (Interrupting) She got character defects.

THE COURT: (Continuing) motion to declare her incompetent.

THE DEFENDANT: She's got ten personalities.  You cannot—that's a Supreme Court case. You cannot use an incompetent witness testimony.

THE COURT: There was no—

THE DEFENDANT: (Interrupting) You allowed that.

THE COURT: Okay. I'm done dealing with him. Take him out. He is not going to understand this. I think it's time that we have a fitness evaluation done on this gentleman.

THE DEFENDANT: You pullin' some shit. You violated my Sixth Amendment right.

(Whereupon, the defendant was removed from the courtroom.)

THE COURT: All right. I'm going to order a fitness evaluation to be conducted of Mr. Champ. I'm not sure that he is competent to proceed."

¶ 22 At a status hearing on October 24, 2017, the following occurred:

"DEFENDANT CHAMP: I don't need no motherfucking evaluation. What is happening with my 120? That is what is happening with my 120 days.

THE COURT: Okay. Well—

DEFENDANT CHAMP: Don't tell me to shut up when I am speaking up for my rights. What is up with my 120 day speedy trial? I ain't crazy just because I'm speaking up for my constitutional rights. Get the fuck out of here. You ain't never seen me since the last court date. This bitch is defective. Get this motherfucker gone. And I asked for another counsel, and I got this for you right here, Wilt. That is for you."

¶ 23 The court and Braun discussed why the evaluation was taking so long. Defendant interrupted and the following exchange occurred.

"DEFENDANT CHAMP: Your Honor, what is up with my 120 day speedy trial? That is what is happening. Fuck that evaluation. I ain't crazy. I know what the fuck I'm saying.

THE COURT: Well, let me stop you here. One of the reasons—

DEFENDANT CHAMP: No, ain't no one other reason now. What is up with my 120 days? I told you that last time.

THE COURT: Until the fitness evaluation issue is resolved—

DEFENDANT CHAMP: Motherfucker I'm not crazy. What the fuck is you talking about?

THE COURT: You can't seem to control yourself in court.

DEFENDANT CHAMP: There ain't no control because you motherfuckers in this courtroom are violating people's constitutional rights. I keep telling your bitch ass that. What the fuck is you talking about? And I am not going to let you violate my constitutional rights. And this bitch here, I keep writing him up like they told me to. Keep writing his ass up for not doing his job.

THE COURT: Mr. Braun is doing what—

DEFENDANT CHAMP: He ain't doing shit. He ain't came to see me since the last court date, Wilt. What the fuck is that?

THE COURT: First of all, my name is not Wilt.

DEFENDANT CHAMP: You work for me. You ain't no motherfucking judge. Do your motherfucking job.

THE COURT: I am.

DEFENDANT CHAMP: I ain't doing your job.

THE COURT: Yes, I am.

DEFENDANT CHAMP: Wilt, he didn't come see me till the last court date, 8/29/17. He does not come see me now. What the fuck is that? My 120 days been violated.

THE COURT: Until there is a determination that you are actually fit—

DEFENDANT CHAMP: I ain't crazy. Ain't shit crazy—don't touch—

THE COURT: Yeah, take him out.

DEFENDANT CHAMP: Get your motherfucking hands off me.

THE DEPUTY: We are leaving the courtroom.

DEFENDANT CHAMP: Get the fuck up off me.

(Whereupon, the defendant was removed from the courtroom.

THE COURT: All right. The record needs to reflect that we ended up having to have Mr. Champ removed from the courtroom. Aside from his inability to conduct himself appropriately in the courtroom and the use—repeated use of inappropriate language, on the way out of the courtroom, he physically attempted to throw an elbow at my bailiff who was trying to escort him out. It was conduct like that that led the Court to direct that a fitness evaluation be conducted."

¶ 24 On October 30, 2017, a status date for the fitness evaluation, defendant presented the court with documents relating to his speedy-trial claim and the following occurred:

"THE COURT: *** If you're going to stand here in front of me and talk to me, you're going to do it appropriately or you're out of here.

THE DEFENDANT: Your Honor, we went through this a thousand times. I have to do this to get your attention."

¶ 25 On December 8, 2017, the parties stipulated to the credentials of Dr. Terrance Lichtenwald, who conducted the fitness examination. The court noted that Lichtenwald, despite some concerns, concluded that defendant was fit for trial. Lichtenwald surmised that defendant's conduct could be "goal directed towards getting the court to follow things the way he saw them that they should be." Based on Lichtenwald's report, the court found defendant fit.

¶ 26    Braun stated that he had agreed to review defendant's concerns and would file any appropriate motions.  The court noted that the problem appeared to be that defendant simply did not understand that the speedy-trial period was tolled between November 10, 2016, when the court granted a new trial, and April 17, 2017, when the court dismissed the indictment.  Defendant persisted that he was granted a new trial on November 10, 2016, and that therefore the time was "way over" 120 days.  The following exchange then took place:

"THE DEFENDANT: I can count.  I know what's going on.  And I've been telling you I've been producing stuff to [Braun].  The stuff he haven't been producing to you, that's the reason why I been telling you that.  I been bringing stuff like this to his attention.

And all of a sudden I'm getting all this old—this patrionism [phonetic] quide [phonetic] pro quo buddy bullshit-ass system y'all got going here. You think I don't pay attention to the signs you doing up there with your hands and all that old stuff?  I know what's going on.  My 120 is violated, [Y]our Honor.  My 120 is violated, and he let y'all violate that.

When you was—when I granted a new trial November the 10th, I supposed to have a speedy trial motion in.  He violated that.  That's what that motion is for.  It's 24 questions about him abandoning my speedy trial rights.

THE COURT: Are you done?

THE DEFENDANT: Yeah, I'm through.

THE COURT: Okay. Now, it's my turn.  On November 10, 2016, I granted you a new trial at the request of Mr. Braun.  He successfully litigated that and obtained a new trial for you.  On April 17—

THE DEFENDANT: He ain't litigate nothing.  You—

THE COURT: Wait a minute. You're done.

THE DEFENDANT: —violated my constitutional right by not giving me a lawyer for advice for—and consultation, and that admonish bullshit you talking about, you can freeze that shit. You violated my constitutional right, and you know you did. I got constitutional rights, and I'm going to stand on my constitutional rights—

THE COURT: Let me remind—

THE DEFENDANT:—and you gonna honor—

THE COURT:—of something.

THE DEFENDANT:—the Supreme Court Rules. Like they say, we say what we mean and we mean what they say. You going to honor them rules—

THE COURT: Okay. Now, are you—

THE DEFENDANT:—crooked ass mother fucking courtroom.

THE COURT: Okay. You're in court.

THE DEFENDANT: I don't give a fuck where I'm at. You're not going to violate my rights, period. You're not.

THE COURT: You're not going to curse in my courtroom.

THE DEFENDANT: You are not going to tell me how to talk when you violating my constitutional rights.

THE COURT: Oh, yes, I am.

THE DEFENDANT: You violating my rights. I been telling you this for the fucking longest.

THE COURT: Take him out.

THE DEFENDANT: All right. That's fine.

THE COURT: All this time is attributable to him because he cannot behave himself. We'll bring him back after we deal with the rest of the call and then we'll see what we're going to do."

¶ 27 After defendant left the courtroom, the court stated:

"Okay. Here's what I'm going to do on that case. It is abundantly clear that he refuses to cooperate and control his conduct in court. Dr. Lichtenwald's report seems to indicate that all that conduct is intentional, that he's got in his own mind the way things should be done and the way court proceedings should go. Dr. Lichtenwald indicated—and I'm paraphrasing—that he would do and say whatever he had to do to get, quote, 'the Court's attention and to get the Court and counsel to do what he wants them to do.' Whether that's intentional or whether or not that's some false belief in his mind what he is doing is the way it needs to be done, I can't say whether or not his cursing at the Court and refusing to show respect to the Court and the parties in these proceedings is intentional or is a manifestation of a problem that's—that he's got.

We had another individual in this courtroom conducted himself the same exact way, and he was ultimately evaluated and determined to be unfit. They sent him to treatment, and he came back and he was much, much better. I suspect there might be some of the same underlying problems with Mr. Champ that Dr. Lichtenwald did not pick up on. I mean, I'm very disturbed by the fact that Dr. Lichtenwald, although saying he's fit, is warning everybody to look out for the fact that he's going to be violent and he's going to physically act out if he doesn't get his way. You can't have somebody doing that in court. Anger issues, explosive, he's got antisocial personality disorder, according to Dr. Lichtenwald. I think it's more than that."

¶ 28    The court expressed concern that, despite finding him fit, the doctor warned that defendant was likely to be violent and physically act out to get his way.  Based on defendant's conduct, the court ordered another fitness evaluation by a different doctor.  The court was concerned that defendant did not appear to understand the role of the court, defense counsel, or the prosecutor because, despite continued admonishments, defendant did not appear to understand or accept the fact that counsel is not required to do everything and anything defendant wanted him to do.  The court opined that defendant appeared to think that the parties all had to do what he wanted them to do as opposed to "really expressing an understanding of what everybody's role in the proceedings are."

¶ 29    On February 6, 2018, the court noted that the second doctor, Dr. Robert L. Meyer, had found defendant unfit.  The parties stipulated to the content of his report.  The following then occurred:

> "THE COURT: ***
>
> Dr. Meyer raised a number of different concerns about Mr. Champ and his behavior and his inability to control his behavior in court.
>
> He's made—Mr.—Mr. Champ's conduct is indicative of what he refers to as transient paranoid delusional beliefs.  It says in the examiner's opinion he suffers from Cluster B personality disorder.
>
> THE DEFENDANT CHAMP: Your Honor, let's get this straight right now.
>
> THE COURT: He has mixed personality traits,—
>
> THE DEFENDANT CHAMP: I don't take no medications.  He's not speaking up for me.
>
> THE COURT: I'm not ask—

THE DEFENDANT CHAMP: He's not speaking up for me. I'm not bound by anything that the lawyer right here did, nothing.

THE COURT: That's fine.

THE DEFENDANT CHAMP: I'm not bound by none of that, and I've been telling you that for the longest. Ain't nothing wrong with me. I'm not crazy. What I'm telling you about, my constitutional rights, point blank, period.

THE COURT: All right."

¶ 30   The parties stipulated to Dr. Meyer's report and the court found defendant unfit. The court noted that Dr. Meyer believed defendant could be restored to fitness within one year, so the court remanded defendant to the Department of Human Services. As the court was speaking, defendant interrupted and the following occurred:

"THE DEFENDANT CHAMP: No, if you're doing that, I'm gonna pop your ass. I gonna write your boss on your ass. I know what to do. I'll write your mother-fucker boss.

(Defendant remanded.)

THE COURT: All right. For the record after Mr. Champ threatened the court, the jail guards took him out.

This has been an ongoing problem with Mr. Champ. He acts up in court on—on— any time he does—something happens that he disagrees with.

And that is actually one of the things that Dr. Meyer focused upon, that Mr. Champ has in his own mind what should happen, and any time anybody disagrees with him, he feels within—he's within his rights to act up and do and say whatever he wants to do or say, which is why he is not able to control himself."

* * *

"THE COURT: ***

All right. Officer, do you think if we brought him back in, he could control himself?

THE COURT GUARD: No, sir, I don't believe he would.

And I just wanted to address the court. My name is Officer Cherry (*sic.* phonetic) with the corrections staff.

I wanted to know if you heard the same thing that I heard. I heard Mr. Champ threaten your life.

THE COURT: I did hear that.

THE COURT GUARD: So I am gonna submit an incident report to that effect."

¶ 31 On November 1, 2018, the court found that defendant had been restored to fitness. The court stated, "Based upon that report, and quite honestly, based upon the contact I've had with Mr. Champ since he's been back I really don't have any concerns about his ongoing fitness."

¶ 32 On December 12, 2018, Judge Debra Schafer presided, as Judge Wilt had been transferred to another courtroom. Braun stated that defendant continued to believe that his speedy-trial rights had been violated. The following exchange occurred:

"THE DEFENDANT: When I was granted a new trial November 10, 2016, my 120 days ran automatically mandatory. He failed to file my 120 day speedy trial motion.

Wilt gave the State's Attorney two court dates to bring the new indictment, December 19, 2016, February 14, 2017. That's 97 days. They didn't have it. Carder was in a murder trial.

April 11, 2017, that's 153 days. They way over my 120, way over.

THE COURT: Mr. Champ, can I assign you some homework? If you could—if you could put these, this information down in writing and—

THE DEFENDANT: (Interrupting) Well, I got—I got some freedom of act information. I already filed that motion. They've been dodging that motion since October 30, 2017, January 1, 2018 conflict of interests. Dodging the motions, circuit clerk. It's already on the docket. The motions need to be heard.

THE COURT: Well, if there are motions, because you have counsel of record, he has to either adopt them or—the Court doesn't consider *pro se* motions. What I'm asking you to do is write down the dates, because you just threw a lot of dates at me, and I am not familiar with your case yet. If you could write all those down and provide them to your attorney, I would appreciate that.

THE DEFENDANT: He has been provided that all the time. Everything that I've been turning over to him since he has been my lawyer, he never produced it to the judge. Never. That's the reason why I had that argument with Wilt. That was the number 1 problem. I'm not cutting you off.

THE COURT: It's Judge Wilt.

THE DEFENDANT: Yeah, Judge Wilt. That's the number 1 problem I was having with him. They have the nerve to send me to Chester. When they sent me to Chester, that doctor gave me some information allowing me to have because they never supposed use that witness without her being evaluated. He gave me some code, let me know that they evaluated—they didn't evaluated her. They violated her rights and my rights. I gave him some codes that the doctor gave me, and he refused to bring them up in court.

THE COURT: We're not going to talk about all of those things today. You just talk about the speedy trial issue. You had some dates that you want to put down—

THE DEFENDANT: Right here, your Honor. Freedom of act of information preserve everything.

THE COURT: If you could provide that to your counsel, and if he doesn't object, he can provide that to me."

¶ 33    On January 7, 2019, Braun moved to vacate his appointment as conflict counsel. The court granted the motion and reappointed the public defender. On January 16, 2019, new counsel Frank Perri stated that he needed time to get the discovery and review the file. Defendant stated as follows:

"How he going to take me to trial if he talking about my speedy trial? There's motions and stuff that he supposed to came and got me. He came and seen me and he only seen me for a little while on the video part. It's stuff I need to give to him to receive to you. And you said last time I couldn't give to you in the courtroom, so I need him to come see me so I can get him these motions and stuff. Ain't no trial. I tell him about my speedy trial, and he gonna tell me, oh, he don't want to hear it. No, I'm not—I don't need him representing me. I can represent myself."

¶ 34    On March 13, 2019, Braun said that defendant had wanted him to file certain motions, that Braun had declined to do so, and that defendant now wanted to proceed *pro se*. The following exchange occurred:

"THE DEFENDANT: I know because my speedy trial issue is constantly, constantly getting ignored. And I feel that my rights are being violated by my speedy trial rights, and I did not ask him if can file no motions, period.

THE COURT: Okay.

THE DEFENDANT: It's the second time he done told a lie.

THE COURT: All right.

THE DEFENDANT: It's the second time.

THE COURT: Well, we'll deal with that tomorrow.

THE DEFENDANT: Unethical, professional work. He's no good as a lawyer. I don't even know why you got him in the courtroom. It's crazy."

¶ 35     On March 14, 2019, the court noted that defendant had expressed a desire to proceed *pro se.* As the court questioned defendant, he continued to argue about the speedy-trial period, contending that his lawyers had refused to present the issue to the court in violation of the Supreme Court Rules. Defendant continued as follows:

"No, I just don't want him because he's not doing—any time a lawyer tells me he can't—he don't have to follow these Supreme Court Rules, he don't need to be representing nobody, period. These are rules that supposed to be followed by a lawyer.

And the lawyer, he telling me, he telling me, [Y]our Honor, that he don't have to follow these rules on this paper, and that's what they say. That's what it say, scope of representation. That's what a lawyer supposed to do."

¶ 36     In response to the court's questioning, defendant said that he had represented himself at the first trial. The court questioned defendant about his education. The court admonished defendant that various rules would apply and that he might not be able to say everything that he wants to say to the judge or jury, including the witness's mental health history. The court ultimately concluded, "I'm not gonna let you represent yourself in this case. I think that you need the help."

¶ 37    The court informed defendant that he could hire his own attorney.  Defendant replied that he wanted a *pro bono* attorney.  The court said, "We gave you one of those."  The court reiterated that current counsel would remain.  Defendant continued to argue that his attorney did nothing for him and that his issues were being ignored.

¶ 38    On April 29, 2019, the case was called for trial.  The court asked Perri whether he had any concerns about defendant's fitness.  Perri said that he did not, and he noted, "[Defendant] speaks to me clearly, lucidly, we communicate well."

¶ 39    The court asked defendant if he had something to say.  Defendant responded that he would like to "record" certain motions.  The court asked if they related to speedy-trial issues and defendant responded:

> "THE DEFENDANT: No, my due process, my double jeopardy, incompetent witness and the video exclude.  They got rid of the video in 30 days.  The video was destroyed while my trial was still going on.
>
> * * *
>
> THE DEFENDANT: Right, I am being tried, yeah, prosecuted for the same stuff, I am being repeatedly for the same offense.  That's my Fifth Amendment right."

¶ 40    Perri explained that defendant had brought these matters to his attention, but he respectfully informed defendant that he was not going to argue them.  Defendant stated:

> "How you say you are not going to adopt any of these Motions, these Motions right here was personally sent, I did these personally, like I was told by the Appellate Court, to see if you all was going to pay attention to these Motions.  She is an incompetent witness by law, Judge, she is disqualified.  That's a Supreme Court issue."

¶ 41 During trial, the parties stipulated that if additional surveillance video for the period following the incident were obtained, it would show defendant entering and leaving Lewis's apartment at least three times. At the end of the trial, the court found defendant guilty of aggravated domestic battery and sentenced him to 12 years' imprisonment. Defendant timely appeals.

¶ 42 II. ANALYSIS

¶ 43 Defendant contends that the trial court erred by denying his request to represent himself at the second trial. He argues that the trial court focused solely on whether defendant was able to conduct his defense ("I think that you need the help") rather than on the correct inquiry, which was whether defendant was able to competently *decide* whether to represent himself.

¶ 44 The sixth amendment (U.S. Const., amend. VI) guarantees a criminal defendant both the right to the assistance of counsel and the corresponding right to proceed without counsel. *People v. Wright*, 2017 IL 119561, ¶ 39 (citing *Faretta v. California*, 422 U.S. 806, 832-34 (1975)). Our supreme court has long recognized that the right to self-representation is "as basic and fundamental as [the] right to be represented by counsel. (Internal quotation marks omitted.)" *Id.* A defendant may therefore waive his or her constitutional right to counsel as long as the waiver is "voluntary, knowing, and intelligent." *Id.*

¶ 45 "Although a court may consider the decision unwise, a defendant's knowing and intelligent election to represent himself must be honored out of that respect for the individual which is the lifeblood of the law." (Internal quotation marks omitted.) *Id.* "The requirement of knowing and intelligent choice 'calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *People v. Baez*, 241 Ill. 2d 44, 117 (2011) (quoting *People v. Lego*, 168 Ill. 2d 561, 564 (1995)). We review for abuse of

discretion a trial court's denial of a defendant's request to waive counsel. *People v. Albea*, 2017 IL App (2d) 150598, ¶ 23.

¶ 46    Generally, a trial court is justified in denying a defendant self-representation in three situations. *People v. Ward*, 208 Ill. App. 3d 1073, 1084 (1991) (citing 2 W. LaFave and J. Israel, Criminal Procedure § 11.5(d), at 47-48 (1984)).  First, a court may deny self-representation where the request comes so late in the proceedings that to grant it would disrupt the "orderly schedule of proceedings." *Id.*  Second, the court may terminate self-representation by a defendant who engages in "serious and obstructionist misconduct." *Id.* (citing *Faretta*, 422 U.S. at 834 n.46.)  Third, a "defendant's request for self-representation may be denied when, despite the court's efforts to explain the consequences of waiver, the court finds the defendant is unable to reach the level of appreciation needed for a knowing and intelligent waiver." *Id.* (citing 2 W. LaFave and J. Israel, Criminal Procedure § 11.5(d), at 47-48 (1984)).

¶ 47    In *Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008), the United States Supreme Court held that the trial court can deny self-representation to a defendant with "severe mental illness," who is incapable of representing himself.  The Court stated that its precedents at least hinted that the right to self-representation was contingent upon a defendant's mental capacity to handle his defense with a minimum level of competence. *Id.* at 174-75.  The court further noted that psychological data suggested that a defendant could have sufficient mental competence to cooperate with counsel yet be "unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 175-76.  Finally, the court noted that self-representation will not " 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel." *Id.* at 176 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 176-77 (1984)).  Rather, "given that defendant's uncertain mental state, the spectacle that could well result from [a

defendant's] self-representation at trial is at least as likely to prove humiliating as ennobling." *Id.* The ultimate concern is the fundamental one of providing a fair trial. *Id.* at 176-77.

¶ 48    Defendant acknowledges *Edwards* but contends that it does not apply because he was not "severely mentally ill." He cites *Albea*, where we held that the trial court erred by denying the defendant self-representation while focusing on the defendant's ability to represent himself rather than his ability to waive the right to counsel. *Albea*, 2017 IL App (2d) 150598, ¶¶ 24-25.

¶ 49    The State responds that defendant's appalling courtroom behavior fits either of two of the three situations that *Ward* identified where a court may deny a defendant's self-representation request. One possibility is that he was genuinely incapable of representing himself, as shown by his (1) disrespect for the court; (2) his seeming inability to understand the proper role of defense counsel and the court, to focus on the topic at hand, or to understand or even acknowledge the court's rulings and admonishments; and (3) his obsessive focus on issues that had already been disposed of, such as the nonexistent video. Alternatively, if—as Dr. Lichtenwald concluded and defendant himself intimated multiple times—his conduct was an intentional attempt to gain a tactical advantage, to essentially wear down the court until it ruled in his favor, then defendant was engaging in "serious and obstructionist misconduct" (*Ward*, 208 Ill. App. 3d at 1084).

¶ 50    In his reply brief, defendant insists that the behavior that the State cites is irrelevant because it occurred when he was "suffering from untreated mental illness." Defendant contends that his behavior changed after he was restored to fitness such that there was no longer any reasonable concern about his ability to choose self-representation.

¶ 51    Defendant fails to provide any meaningful record citations in support of these assertions or really to even explain them. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Specifically, defendant fails to provide record support for his assertions that (1) he suffered from a mental illness; (2) it

was untreated; (3) this illness precipitated his abysmal courtroom behavior; and (4) he was no longer experiencing such symptoms at the time he sought to waive counsel.[2]

¶ 52    Defendant appears to refer to Dr. Meyer's conclusion that defendant's behavior was, in the trial court's words, "indicative of what he refers to as transient paranoid delusional beliefs." The court also noted that Dr. Meyer had concluded that defendant was suffering from "[c]luster B personality disorder" and "mixed personality traits." Based on this report, the court found defendant unfit for trial. Later, on November 1, 2018, the trial court found that defendant was restored to fitness. Defendant appears to equate this with a finding that he no longer suffered from a mental illness. This is a mistake. The trial court did not purport to assess whether defendant still suffered from a mental disorder, nor should it have. The court's focus was on whether defendant was still "unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2018). Fitness for trial and overall mental health are not synonymous. "Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound." *People v. Easley*, 192 Ill. 2d 307, 320 (2000); see also *People v. Stephens*, 2012 IL App (1st) 110296, ¶ 92. Thus, there is no necessary correlation between defendant's fitness for trial and his sanity.

---

[2] Defendant cites to "Supp R. 834-35" and "Supp. R. 845-47," but none of the four volumes of supplemental record appears to contain corresponding pages relevant to this issue. Pages 834-35 and 845-57 of the supplemental report of proceedings appear to contain random examples of defendant's disorganized thinking but do not include any medical opinions that he was suffering from a mental illness at that time.

¶ 53    The first reference that we have found in the record regarding defendant's mental illness was at the second fitness hearing, on February 6, 2018, where Dr. Meyer's findings were reported. Previously, defendant was examined by Dr. Lichtenwald, who concluded that defendant's conduct was "intended" and "goal directed towards getting the court to follow things the way he saw them." The parties stipulated to Dr. Lichtenwald's report, and the court found defendant fit.

¶ 54    Defendant contends that, following the trial court's November 1, 2018, finding that he was restored to fitness, his courtroom behavior improved, showing his competency to elect self-representation. The record, however, does not support this contention.

¶ 55    Indeed, defendant's comportment improved somewhat. He refrained from cursing and did not threaten the court. However, it appears that little else had changed. On December 12, 2018, the next court date after defendant was restored to fitness, he interrupted the court to talk about the speedy-trial issue. Defendant soon went into a virtually unintelligible diatribe about the earlier fitness hearing, claiming that an unnamed employee at the Chester Mental Health Center had given him "codes" apparently having something to do with the victim's mental health.

¶ 56    On January 16, 2019, defendant continued to complain that his attorney was not adopting defendant's *pro se* motions and continued to argue the speedy-trial issue. On March 13, 2019, despite the numerous times the issue had been explained to him, defendant persisted in complaining that his speedy-trial concerns were being "ignored." After the trial began on April 29, 2019, defendant tried to argue his *pro se* motions and complained about "my due process, my double jeopardy, incompetent witness and the video exclude." He claimed that the surveillance video was destroyed during the first trial.

¶ 57    In short, defendant continued to express most of the same irrational beliefs that he had expressed before he was found restored to fitness. He continued to believe that his lawyer was

little more than a law clerk—a conduit to convey to the trial court whatever defendant wanted. He continued to have trouble staying on topic and went off on wild, barely understandable tangents. He continued to fixate on certain issues despite numerous explanations from two judges and three defense attorneys about why those issues were not viable.

¶ 58    This conduct establishes more than defendant's inability to represent himself; it proves that he was unable to rationally decide to represent himself. Most importantly, defendant simply could not understand the proper role of defense counsel, and thus he did not understand what he was giving up by proceeding *pro se*. A waiver of counsel must be voluntary, knowing, and intelligent. *Wright*, 2017 IL 119561, ¶ 39. Put simply, defendant could not be said to have given up a right, the nature of which he did not understand.

¶ 59    Even after trial began, defendant continued to believe that he would succeed on his contentions that he had an absolute right to have the complaining witness examined for mental competency and to have her testimony barred if the results were not to his liking, that his speedy-trial rights had been violated, that he was being subjected to double jeopardy after the court awarded him a new trial, and that he was entitled to some type of unspecified relief based on the nonexistent video. He apparently viewed defense counsel as an impediment to bringing these issues to the trial court's attention and that, with defense counsel out of the way, he could raise these issues himself and succeed. Thus, his desire to proceed *pro se* was based not merely on questionable trial strategy but on a fundamentally flawed and irrational view of the law, the legal system, and the proper roles of the court and defense counsel.

¶ 60    In his opening brief, defendant attempts to distinguish *Edwards* on the ground that he was not "seriously mentally ill." However, he asserts in his reply brief that he *was* mentally ill but received treatment. As noted, he cites no record evidence that his symptoms went into remission,

and indeed the record shows otherwise. In the end, the *Edwards* court's primary concern was with providing the defendant a fair trial. *Edwards*, 554 U.S. at 176-77. In no way would it be fair to allow a defendant laboring under such serious misconceptions to represent himself at a trial where, if convicted, he was exposed to Class X sentencing. *Albea*, on which defendant relies heavily, is distinguishable in that the defendant there demonstrated no such irrational beliefs or obstructive behavior.

¶ 61   We agree with the State that if defendant was *not* mentally ill, then his behavior throughout the proceedings could reasonably be seen as "serious and obstructionist misconduct." *Ward*, 208 Ill. App. 3d at 1084. The State contends that, although the trial court did not expressly find that defendant was irrational or deliberately obstructive, the court's vague comment that defendant "need[ed] the help" is close enough. We need not decide this question because we may affirm on any ground supported by the record (*People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 27) and the record amply shows that defendant either was irrational or engaged in intentional misconduct.

¶ 62                             III. CONCLUSION

¶ 63   The judgment of the circuit court of Winnebago County is affirmed.

¶ 64   Affirmed.